[Civ. No. 2260.   Third Appellate District.—March 3, 1921.]

PYRAMID LAND AND STOCK COMPANY (a Corporation), et al., Appellants, v. C. A. SCOTT et al., Respondents.

[1] Waters and Water Rights—Riparian Owners—Prescription.— While the right to take water from a stream, as against riparian owners, may be acquired by prescription, no such right may be acquired either by prescription or by appropriation by a lower as against an upper riparian owner in the same stream.

[2] Id.—Appropriation of Water — Rights Acquired. — No right to the water of a stream can be acquired by prescription where the

---

1. Nature of riparian rights and lands to which they attach, notes, 9 Ann. Cas. 1235; Ann. Cas. 1913E, 709; Ann. Cas. 1915C, 1026; 41 L. R. A. 737; 11 L. R. A. (N. S.) 1062.

lower riparian proprietor has taken the water out of the stream at a point on his own land and has used such water only as the upper riparian proprietor permitted it to pass down through his land to the lower owner; nor can the nonuser of the water by the upper riparian owner of land be invoked to strengthen the claim of appropriation or prescription by the lower riparian owner under like circumstances; but where the upper riparian owner appropriates the water the lower owner is injured at once and the law gives him a remedy, and if he fails to avail himself of it, the appropriation may, by lapse of time, ripen into an absolute right.

[3] ID.—NATURE OF RIGHT TO WATER—DEPRIVATION OF—EVIDENCE.— The rights of riparian owners in the water of a stream are not mere easements or appurtenances to their lands, but are parts and parcels of their lands and of the ownership thereof, and they should not be deprived of those rights upon the plea of adverse possession or prescription unless such plea is sustained by the clearest and most satisfactory proof.

[4] ID.—QUIETING TITLE—EVIDENCE—FINDING.—In this action by lower riparian owners to quiet their title as against upper riparian owners to the water of a certain stream, a fair and reasonable interpretation of the whole evidence did not justify the finding that the defendants had by prescription or adverse user acquired the riparian rights of the plaintiffs in the stream in question.

APPEAL from a judgment of the Superior Court of Lassen County. H. D. Burroughs, Judge. Reversed.

The facts are stated in the opinion of the court.

N. J. Barry for Appellants.

Pardee & Pardee and R. M. Rankin for Respondents.

HART, J.—This action was brought by plaintiffs to quiet their title as against defendants to the water of Long Valley Creek, a creek flowing northerly through the lands of all of the plaintiffs and defendants and thence into Honey Lake, in Lassen County, California.

Plaintiffs in their complaint claim as appropriators and as riparian proprietors. Defendants claim as appropriators and as riparian proprietors and by amendment to their answer claim prescriptive rights.

The court found that defendant Scott had an adverse right to 90 inches of the waters of the creek and defend-

ants Galeppi had an adverse right to 310 inches of the waters of the creek. The court failed to find that the plaintiffs were appropriators, but did find that both the plaintiffs and defendants were riparian owners, and as to this the court found that plaintiff Pyramid Land and Stock Company has 1,200 acres of land riparian to said Long Valley Creek; that plaintiff F. M. Rowland has 400 acres of land riparian thereto; that plaintiff A. J. Hill has 560 acres of land riparian to said creek; that defendant C. A. Scott has 1,120 acres, and defendants Galeppi have 400 acres of land riparian thereto.

It was further found that the several defendants and their predecessors in interest have taken, ever since the year 1861, out of said stream and used for the necessary irrigation of their said lands all the water required to produce agricultural crops thereon; that the quantity of water so taken by defendant Scott and his grantors was 90 miner's inches, and that the water so taken and diverted by the defendants, the Galeppis, and their predecessors in interest, was 3,500 gallons per minute, or 310 miner's inches; that said several defendants have used the respective quantities of water mentioned for a useful and necessary purpose upon their respective lands, and have "severally been in the open, notorious, continuous, exclusive, uninterrupted, and adverse possession and use of said water and all thereof, as aforesaid, holding and using the same adversely to the plaintiffs and each of them, and adversely to all other persons, for more than five years before the commencement of this action; that neither nor any of said plaintiffs was or were seised or possessed of the right to use said water or any part thereof within more than five years before the commencement of this action"; that the holding and use of said water was under a claim of right and title by said defendants, and exclusive and hostile to any right, title, or claim of possession or use by said plaintiffs or either of them, or their predecessors in interest or grantors, etc.; that said defendants have during all of said period paid all taxes of whatsoever kind or nature levied or assessed upon said lands and water rights, etc.

The evidence shows, and, indeed, it is practically if not expressly admitted that Long Valley Creek is one of those so-called wet season streams that flow an enormous lot of

water at the high-water season and toward the end of
the season run down to almost nothing—in other words, it
is what is sometimes called a torrential mountain stream.

It was expressly stipulated by the parties at the trial
that "the country in which all of the lands of plaintiffs
and defendants are situated is an arid country, and that
artificial irrigation is necessary."

The judgment is that defendant Scott was entitled to
90 miner's inches of water from the creek and defendants
Galeppi to 310 miner's inches from said creek, and that
the "plaintiffs take nothing by their action."

The plaintiffs appeal from said judgment. The points
urged for a reversal are: (1) That the court erred in
failing to make any finding as to the claims of the plain-
tiffs as appropriators; 2. That there is no evidence to sup-
port the finding that the defendants have acquired a right
to use the water by prescription; 3. That there is neither
evidence nor any finding which supports that part of the
judgment that the "plaintiffs take nothing by their ac-
tion."

[1] The failure of the court to find upon the claim
of plaintiffs, the lower riparian owners, that they had ap-
propriated respectively a certain specified number of miner's
inches of the waters of Long Valley Creek is not material,
since it is the settled law in California that, while the
right to take water from a stream, as against riparian own-
ers, may be acquired by prescription (*Gallaher* v. *Mountain
Valley Water Co.,* 101 Cal. 245, [35 Pac. 770]; *Bathgate*
v. *Irvine,* 126 Cal. 144, [77 Am. St. Rep. 158, 58 Pac.
442]; *Arroyo D. & W. Co.* v. *Baldwin,* 155 Cal. 280, 285,
[100 Pac. 874]), no such right may be acquired either
by prescription or by appropriation by a lower as against
an upper riparian owner in the same stream. In view,
however, of the fact that the decree complained of here is
grounded upon findings of a prescriptive title in the de-
fendants to certain specified quantities of waters in the
creek in question as against the riparian rights of the plain-
tiffs, it is proper to say that the rule has been declared
to be different as to upper riparian proprietors. In *Bath-
gate* v. *Irvine,* 126 Cal. 135, 140, [77 Am. St. Rep. 158,
58 Pac. 442, 444], the law upon this proposition is thus
stated: "Plaintiffs contend that as lower riparian proprie-

tors they acquired the right to all the waters of the creek
by prior appropriation, notwithstanding defendant and his
predecessors in interest were upper riparian owners long
before plaintiffs made their appropriation. We understand
the rule to be settled, and is no longer open to discussion
in this state, that such right cannot be thus acquired.
(*Hargrave* v. *Cook*, 108 Cal. 72, [30 L. R. A. 390, 41
Pac. 18].) [2] And it is equally well settled that no right
to the water can be acquired by prescription where the
lower riparian proprietor has taken the water out of the
stream at a point on his own land and has used such
water only as the upper riparian proprietor permitted
it to pass down through his land to the lower owner;
such use by the latter is not adverse in the sense required
to give a right by prescription. (*Hargrave* v. *Cook, supra.*)
Nor can the nonuser of the water by the upper riparian
owner of land be invoked to strengthen the claim of ap-
propriation or prescription by the lower riparian owner
under like circumstances. (*Hargrave* v. *Cook, supra.*) In
appropriating the water which flows across his land, the
lower proprietor invades no right of the upper riparian
proprietor. The latter has no right of action to prevent
such use, for he is in nowise injured, and the former should
not be permitted to acquire a right in this manner which
the latter is powerless to prevent. *The case is quite differ-
ent where the upper owner appropriates the water. The
lower owner is injured at once and the law gives him a
remedy, and, if he fails to avail himself of it, the appropria-
tion may, by lapse of time, ripen into an absolute right."*

The essential theory of the decision is that the plaintiffs
permitted their riparian rights to be invaded by the de-
fendants and failed to take timely steps toward invoking
the remedy available to them for preventing the ripening
of the wrong into a right, and we shall upon that theory
consider the case.

As stated, plaintiffs, with respect to the defendants, are
lower riparian owners, and their lands are commonly known
as the "Constantia ranch," the "Rowland lands," the "Fri-
day field," and the "Doyle lands." The plaintiff Pyramid
Land and Stock Company is the owner of the so-called
Constantia properties, the plaintiff Hall of the Doyle and
"Friday" lands, and the plaintiff F. M. Rowland of the

Rowland lands. It appears from the testimony presented by the plaintiffs that these lands have for many years been used for growing hay and other agricultural products, and that, being located in a section of great aridity, are wholly unavailable for any such use without the aid of irrigation. As the court found, and as is conceded, said lands, as well as those of the defendants, are riparian to Long Valley Creek, from which both the plaintiffs and the defendants claim to have, for many years, by means of ditches, taken and used the waters of said creek for the irrigation of their several tracts of land.

As we have seen, the court found that the defendant Scott had, ever since the year 1861, taken and used 90 miner's inches of the waters of said creek for agricultural purposes and that for a like number of years the defendants Galeppi had taken and used for a like purpose 3,500 gallons per minute or 310 miner's inches of said waters, and that all said defendants had severally so diverted and used said waters and been in the open, notorious, continuous, exclusive, uninterrupted possession and use of the same, adversely to the plaintiffs and to all other persons, "for more than five years before the commencement of this action," the action having been commenced in the year 1916. As also seen, the court, from its findings, concluded, as a matter of law, that the plaintiffs were entitled to take nothing by their action. In other words, the necessary effect of the decree is, from the findings and conclusions of law, that the defendants had acquired a prescriptive right to all the waters of Long Valley Creek, and that, therefore, the plaintiffs have lost their riparian rights in said creek and, consequently, have no rights in the waters thereof as to which an adjudication is necessary or required.

It is not within the province of this court, as is obvious and as has often been pointed out by the decisions, to resolve conflicts in the evidence addressed to issues of fact, or, in other words, to examine conflicting evidence with a view of determining whether the conclusion arrived at below should have been different or in accord with the evidence presented by the opposing litigant. In this case, however, an examination and an analysis of the evidence presented by the plaintiffs in support of their several and

respective claims, in connection with a like consideration of the evidence presented by the defendants, have convinced us that, upon the all-important issue in this case, there is really no conflict in the evidence. Hence it is proper as well as important, in disposing of this appeal, to consider herein the evidence presented by the plaintiffs.

The plaintiff A. J. Hall testified that he farmed the Constantia ranch continuously for five years, from 1905 to 1910; that he superintended the irrigation of said ranch with the waters of Long Valley Creek; that there were at that time two ditches used for the purpose of irrigating the "Friday" lands, and that during the entire period of time he was at Constantia "we always had water for the Friday field"; that about 150 acres of the Friday field were irrigated, and that "no one ever interfered with our use of the water." He further testified that from said creek he had irrigated about 200 acres of the Doyle tract since 1910. Hall testified that either in the year 1913 or 1914 the defendants Galeppi installed a pumping plant for the purpose of pumping water from the creek into their ditches, and that they commenced pumping in the year 1915. "Previous to that," he continued, "there was a difference in the way the waters flowed down to me. In the morning I would have a good head of water in the ditch and along toward night it would be down and the next morning it would be up again. When they put in the pump it shut off and no more came after that."

C. C. Rowland, son of the plaintiff Rowland, testified that the Rowland lands are and have been irrigated with the waters of Long Valley Creek for about thirty years, he having known the said lands for that period of time; that there were two ditches by means of which such irrigation was done, and that through those ditches have said lands been irrigated every year, "except a few dry years when there was no water." He testified that he remembered when the Galeppis commenced pumping—his best memory was that it "was last year and this year." (This action was begun in the year 1916 and the trial had in the year 1917.) "I remember last spring," the witness proceeded to testify, "we were getting a good head of water until the pump was started and then we didn't get any more. Previously to the time they started pumping we got water

later in the season, except, of course, the year before they started to pump; they had a dam in the stream and that stopped the water. We have raised mostly grass hay and pasture."

R. C. Turritin, general manager of plaintiff, Pyramid Land and Stock Company, testified that, as a representative of the Nixon National Bank of Reno, which corporation owned the controlling interest in the Pyramid Company in the year 1911, he looked over the Constantia and other properties of said plaintiff and that from that year since he has known that said Constantia ranch and the Friday field were irrigated with the waters of the creek in question. The witness early in the year 1914 took possession of the Pyramid's properties (the Constantia and the "Friday"), and down to the time of the trial had had such possession continuously, and he testified that during all that time the lands named were each year irrigated by means of ditches connecting with Long Valley Creek. He continued: "We raised alfalfa, grain, and wild hay. On the east side we had a ditch that irrigated the Friday field. We raised alfalfa and some grain on the east side. A portion of the lands we were still to irrigate for the second crop. We have been able to irrigate the Friday field twice." The witness stated that the Galeppis commenced pumping in the year 1916, and that from and after that time the water would be "shut off" so that it would not reach the lands of the plaintiffs—very often or generally that condition would last for twelve hours. In the year 1915, he said, 1,250 tons of hay were raised on the Pyramid's lands. At that time the Galeppis were not pumping. Since that year the average number of tons of hay produced on said plaintiff's lands was about 700. Turritin said that the only interference that had been with his water supply had been due to the pumping by the Galeppis.

Other witnesses corroborated the above testimony in so far as it relates to the claim of the several plaintiffs that they had always and without interruption, except when interfered with by the pumping of the water of the creek by the Galeppis into their ditches, used the waters of said creek for the irrigation of their respective tracts of land.

Adverting now to the testimony received in behalf of the defendants, we find this to be about the substance thereof: That since the year 1879, the lands now owned by the defendants have been irrigated from Long Valley creek; that the lower riparian proprietors, or the owners of the lands now owned by the plaintiffs, never interfered with the use of the said waters by defendants; that there were times when all the waters of the creek were necessary for the irrigation of the lands of defendants and the latter would then use all said waters for that purpose. The witness, defendant Scott, testified that he had, by means of a ditch, diverted water on to his lands from the year 1901, in which year he became owner of said lands, down to the year 1916, without interruption or protest from any person. "My ditch," he said, "comes out of the creek just below where the Hot Springs come in. I think those springs flow in the neighborhood of 90 inches. . . . The ditch was there when I first knew the place. The capacity of the ditch is about the same now as when I took it. . . . The Springs that I spoke of are close to the creek. I diverted the water by damming the channel of the creek; that catches the water of the creek, also the waters of the spring. I tried to turn it all. . . . The creek is not in view of the road. To find out I was taking the water they would have to go up the creek and see my dam and ditch, the Constantia people. . . . I never saw them up there before this spring. . . . I never knew of their being up there." Scott further said that he lost approximately twenty-five per cent of the water he attempted to divert to his ranch; that he measured the water as it was flowing on to his ranch and that he found that it amounts to "something around 100 inches." He continued: "Before this I measured it as it went off, and there was 150 inches going off. The engineer said we were losing twenty-five per cent. *Under these conditions, I don't think the people below would ever know we were using it. I don't think I ever told Hall or Rowland or the Pyramid people that I claimed the right to divert all the waters of the stream.* Most generally after the flood waters quit after the 1st of June, I would hold them until the 1st of October, except at haying time, when it was turned loose. There was always water flowing off my ranch. *I never claimed the*

*right to deprive those people of water below me all the
time. I understood they had rights."*

Frank Galeppi, one of the defendants, testified that a
centrifugal pump, operated by steam, with a pumping ca-
pacity of 3,500 gallons per minute, was installed in the
year 1916 for the purpose of pumping water from the
creek on to the Galeppi lands. "At that time," he pro-
ceeded, "there was about three times more water in the
creek than the pump could throw. We had a five-foot
dam in the creek. We couldn't lower the water with the
pump. . . . When we started the pump we ran not to ex-
ceed twelve hours. After the water got low, by changing
the dam, we could save the water a little longer than
eleven hours. . . . We took the water out on both sides
of the creek, and used it in the old ditches. We started
to pump this year the 20th of May. Under the con-
tract we made we ran it up to the 25th of June; then we
had to lay off for a while. We laid off for five days, I
think. We ran it according to the time stated in the stipu-
lation. They [the Constantia people] had it from the 30th
of June to the 7th of July. From July 8th to July 13th
it was not operated. The water was permitted to flow down
the creek. On the 13th of July *we were privileged* to close
the gate so as to raise the water in the dam sufficiently
for us to use the pump, and we ran it then to the 18th—
that it the last day I pumped."

Charles Galeppi, son of defendant Rosa Galeppi, C. E.
Jones, David Cameron, and William Galeppi, also son of
Rosa Galeppi, gave testimony for the defendants, but, re-
duced down to its real scope and purport, none of it
amounted to more than the mere statement that the lands
of the defendants had for many years been irrigated by
waters diverted by one means or another from Long
Valley Creek. It should be stated, however, that, on cross-
examination, Charles Galeppi said that "there was always
lots of water went down to the plaintiffs every year—that
is, when the water was high, not when the water was short."
He further testified, on cross-examination: "We never told
these people that we owned all the water and that they had
no rights, those people below. We never at any time
claimed all the water in the creek." On redirect, however,
the witness qualified that testimony by saying: "All the

water was in the creek, we didn't claim it all but what water during the time we needed it. My understanding with regard to our water rights was at low-water stages we took it all. I understood we had the right to take it all.''

Thus we have set out, largely in synoptical fashion, all that was offered and received in the matter of proof in support of the respective claims of the parties to this action, and, as declared in the outset, we are unable to perceive any conflict in the evidence, as it was presented by both sides, upon the substantial or vital issue submitted for adjudication herein.

The differences arising between the upper and lower riparian owners seem to have occurred shortly before the institution of this action and were due to the installation of the pumping system on the lands of the Galeppis to pump the waters of the creek on to their lands, thus causing, as was claimed by plaintiffs, such a diminution in the usual flow of the waters of the stream as practically to deprive the plaintiffs of the quantity of the waters ordinarily passing down and so becoming available for use on their property and thereby depriving them of the necessary use of said waters. The witnesses, it will be noticed, referred to an agreement entered into between the Pyramid representatives and the Galeppis, under and by the terms of which the Galeppis were to cease pumping for a certain number of days during a specified month of the irrigating season. The said agreement is not in the record and we are consequently without light as to its specific terms, but from the testimony relating to it we may infer that its purpose was to facilitate a reasonable use of the waters of the stream by both the lower and upper riparian proprietors. From the whole situation as it is shown by all the evidence, we may well assume that the object of the agreement was merely to adjust the use of the waters by all the parties so that all might have an opportunity, in the exercise of their rights as riparian owners, to as reasonable a use of the waters of the creek for the irrigation of their lands as the existing conditions would permit. But be that as it may, it is very clear to our minds that, upon the testimony presented by the defendants, the finding of a prescriptive title in them to all the waters of Long

Valley Creek cannot justly be predicated. In the first place, we are justified in observing that the evidence produced by the plaintiffs that they had for many years continuously used the waters of said creek for the irrigation of their lands and that they had constructed and maintained lateral ditches for that purpose is not only not directly contradicted by but in no way conflicts with any testimony presented by the defendants. The defendant Scott and the witness Charles Galeppi, whose testimony was the strongest of any given in behalf of the defendants, each declared, as shown, that the defendants, at all times, recognized that the plaintiffs had rights in the waters of the stream and that they had never intended depriving the latter of their rights. This testimony, considered without regard to the uncontradicted proofs made by the plaintiffs, is itself sufficient to demonstrate that the defendants never at any time used said waters in hostility to the rights of the plaintiffs, under a claim of right, much less for the statutory period prescribed for the establishment of title to real property by prescription or adverse possession. Moreover, we have found no evidence clearly warranting the finding that the defendant Scott has the right to the use of 90 miner's inches and the Galeppis to 310 miner's inches of the waters of said creek. There is no testimony which shows that exact or any proper measurements had been made of the respective quantities of waters used by the defendants. Scott merely expressed the opinion— that is, it amounted to no more than an opinion—that 90 miner's inches of water had usually been diverted through his ditch to his lands from said creek—some of this, however, from what was known as the ''Hot Springs.'' The only testimony which could by any possibility be said to support the finding that the Galeppis had used as much as 310 inches of water is that describing the pumping capacity of the pump installed on their lands about a year before the commencement of this action. That testimony falls quite short of showing that 310 miner's inches of waters had for over five years been habitually used by the Galeppis or that that quantity of water was necessary for their purposes.

[3] It must be borne in mind at all times that the decree here, should it be permitted to stand, will deprive

the plaintiffs of their riparian rights—rights which do not involve mere easements or appurtenances to their riparian lands, but which are parts and parcels of their lands and of the ownership thereof. (*Hargrave* v. *Cook,* 108 Cal. 72, 77, [30 L. R. A. 390, 41 Pac. 18] ; *Duckworth* v. *Watsonville etc. Co.,* 150 Cal. 520, [89 Pac. 338] ; *Anaheim Union Water Co.* v. *Fuller,* 150 Cal. 327, [11 L. R. A. (N. S.) 1062, 88 Pac. 798] ; opinion òf supreme court denying petition for hearing in *Peake* v. *Harris,* 48 Cal. App. 363, 380, [192 Pac. 310, 317 et seq.].) It is safe to say that in nearly every case where title to real property is sought to be established by adverse possession or prescription, which is based entirely upon the presumption of a grant of such property to the party so claiming it or to his predecessors in interest, there has in point of fact never been a grant or conveyance to the adverse claimant or his predecessors for a consideration. Hence, no person should be deprived of his property rights upon the plea of adverse possession or prescription unless such plea is sustained by the clearest and most satisfactory proof. Indeed, the proposition as thus stated has been plainly and positively declared in the cases.

In *Clarke* v. *Clarke,* 133 Cal. 667, 669, it is said: "The law will not allow the land of one person to be taken by another, without any conveyance or consideration, upon slight presumptions or probabilities," citing *Niles* v. *Los Angeles,* 125 Cal. 576. Again, in the same case, the proposition is thus stated: "The burden is upon the party who claims title by prescription to clearly prove by competent evidence all the elements essential to such title. The user must have been adverse to the true owner and hostile to his title. It must have been actual, continued, open, and under a claim of right. It must have all the elements necessary to acquire title by adverse possession," citing *Thomas* v. *England,* 71 Cal. 459.

Testing the undisputed facts of this case by the principles enunciated in the above-named cases, it is manifest, as we have already declared, that the finding that the defendants have by prescription or adverse user acquired the riparian rights of the plaintiffs in the stream in question (and such is the effect of the finding and the decree) cannot stand.

[4] We think that a fair and reasonable interpretation of the whole evidence justifies the conclusion that the court in

this case should have adjusted the differences between the parties to this suit upon the basis of their riparian rights, and that, therefore, it was error for the court to conclude as a matter of law that the plaintiffs were not entitled to have their rights in the stream specifically fixed.

The rule as to the reciprocal rights of upper and lower riparian owners in a common stream is that each has the right to the reasonable use of the waters thereof, and we think it is clear that, upon the evidence as it is disclosed by this record, the decree should have been framed in accord with that principle. And, in view of a new trial, we suggest, if it be found that there cannot be, by reason of the insufficiency of the flow of water in the creek at times when irrigation is required in that section, a simultaneous use of part of the waters of the stream by both the upper and lower riparian owners, that the doctrine of rotation be applied as it is explained in *Hufford* v. *Dye,* 162 Cal. 147, and the cases cited on page 161, [121 Pac. 400, 406], of that case, as applicable to riparian proprietors as well as to appropriators where such a condition is found to exist.

The judgment is reversed and the cause remanded.

Prewett, P. J., *pro tem.,* and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 2, 1921.

All the Justices concurred.