[Civ. No. 2855.  Third Appellate District.—August 31, 1925.]

ALICE WITHERILL, the Executrix, etc., Respondent, v.
A. BREHM et al., Appellants.

[1] WATERS AND WATER RIGHTS—REQUISITES FOR TITLE BY PRESCRIPTION.—The requisites for acquiring title to water by prescription are that the use must have been open, continuous for a period of five years or more, under a claim of right, and must have been beneficial, and the taxes paid by claimant; and the statutory period necessary to acquire prescriptive rights need not necessarily be the five years immediately preceding the commencement of the action.

[2] ID.—BENEFICIAL USER—TIME.—To acquire title to water by adverse possession, it must have been used with a claim of right,

1. Requisites for procuring water rights by prescription, notes, 59 L. R. A. 838; 93 Am. St. Rep. 717. See, also, 25 Cal. Jur. 1157; 27 R. C. L. 1291.

2. See 25 Cal. Jur. 1160; 27 R. C. L. 1291.

uninterrupted, and for a beneficial purpose; and the extent of the user's right is limited not by the quantity of water actually diverted, nor by the capacity of the ditch, but by the quantity which is applied for beneficial purposes; and it is not necessary that a claimant should use the water all the hours of each day, nor every day in the year for the prescribed statutory period, in order to establish uninterrupted or continuous use; it is only necessary that he shall have used it continuously during those portions of the day or year as required for the beneficial use to which it is applied.

[3] ID.—PRESCRIPTIVE RIGHT AGAINST RIPARIAN OWNER.—The right to take water from a stream may be acquired by prescription, by a nonriparian owner, as against a lower riparian owner.

[4] ID.—WATER RIGHT AS APPURTENANCE—SUFFICIENCY OF CONVEYANCE.—In order to convey an easement in water flowing through a ditch for the purpose of irrigating land, the water rights need not be mentioned in the deed, as water diverted from a stream, and flowing through a ditch to irrigate land, or for domestic purposes, is appurtenant to the land, and is real property, and passes with the deed to the property without specifically mentioning such appurtenance.

[5] ID.—DEED OF REAL PROPERTY—APPURTENANCES.—Where a deed contains language conveying real property "together with the appurtenances thereunto belonging," this is sufficient conveyance of the water rights appurtenant to the land.

[6] ID.—METHOD OF TRANSMITT|NG WATER—REASONABLE USE OF OPEN DITCH—JUDICIAL NOTICE.—In determining the method to be pursued in transmitting water for irrigation, a court should consider all the conditions and surrounding circumstances of the case; and in this action the method of transporting the water and applying it to the land was not unreasonable, in view of the fact that the open ditch had been used for conveying the water in question since its appropriation in 1854 and, as the courts will take judicial notice, that was the usual method resorted to in the early mining days of California for mining and for irrigation.

[7] ID.—RAILROAD GRANTS—RESERVATION OF WATER—RIGHTS OF PRIOR APPROPRIATOR.—Notwithstanding the act of Congress of July 25, 1866, granting to the Central Pacific Railroad Company certain lands, did not make any express reservation in favor of appropriators of water on the public domain for mining, irrigation or manufacturing purposes, the rights of a prior appropriator were prior and superior to the riparian rights afterward acquired by a grantee of said lands from the railroad company.

---

3. See 25 Cal. Jur. 1148.
4. See 9 Cal. Jur. 286; 26 Cal. Jur. 205; 8 R. C. L. 1070.
6. See 26 Cal. Jur. 133.

[8] ID.—QUIETING TITLE—JUDGMENT—COSTS.—In an action to quiet title to certain rights alleged to have been acquired by prescription to a specified quantity of the water of a particular creek, if plaintiff's title is quieted as to at least a portion of the water claimed by him, costs are not improperly taxed against defendants.

[9] ID.—NEW TRIAL—CONTINUANCE BEYOND STATUTORY PERIOD—ABSENCE OF PREJUDICIAL ERROR.—In this action it was not prejudicial error for the court, in the absence of counsel, and without opposition, to continue defendants' motion for a new trial to a time beyond the limitation within which the motion must be made under section 660 of the Code of Civil Procedure, where seven several continuances were had, one at the motion of defendants, five by consent of respective counsel, and finally at the court's own motion, in the absence of counsel, at the regular time set by consent for the hearing of the motion, and at the time of the preceding continuance, when respective counsel were present and consented thereto, the two months allowed by said section of the code had already elapsed.

[10] ID.—DUTY OF MOVING PARTY—ABSENCE OF DILIGENCE.—The defendants in such action were bound to take notice of the limitation of time within which to present their motion for a new trial, and it was their duty to be present and see that it was set within the statutory time, and if it had been inadvertently continued by the court at a time while the right to present the motion was still alive, they should have moved the court to advance the matter on the calendar, and where they were guilty of a lack of diligence in the prosecution and presentation of their motion, they cannot complain of the inadvertence of the court in continuing their motion to a time beyond the statutory limitation at which it would be deemed to be automatically denied.

[11] ID.—DUTY OF WATER—POWER OF COURT TO DETERMINE.—In this state there is no statute regulating the duty or amount of water reasonably necessary for irrigation, but the court must fix the reasonable duty of water.

[12] ID.—PRESCRIPTIVE TITLE—EXCESSIVE JUDGMENT.—In this action to quiet title to certain rights alleged to have been acquired by prescription to a specified quantity of the water of a particular stream, in view of the fact that the evidence would not warrant a finding of more than twenty acres having been irrigated, the judgment of the trial court awarding plaintiff title to seventy-five inches measured under a four-inch pressure, to be used for domestic and irrigation purposes, was clearly excessive.

[13] ID.—PARTIAL USER—ERRONEOUS JUDGMENT.—In such action, where the evidence showed without contradiction that plaintiff did

8.  See 22 Cal. Jur. 192.
11.  See 25 Cal. Jur. 1043.

not require or use any of the water for irrigation purposes from November to April or May, the judgment erroneously quieted title to water the year around without regard to those months during which it was not in fact used.

---

(1) 40 **Cyc.**, p. 695, n. 42, p. 696, n. 43, p. 697, n. 45, 48, 51, 52, p. 698, n. 60, p. 700, n. 77, p. 716, n. 94, p. 764, n. 1.   (2) 40 **Cyc.**, p. 695, n. 39, p. 696, n. 43, p. 697, n. 45, 46, 51, 52, p. 700, n. 77, p. 715, n. 91, p. 734, n. 32.   (3) 40 **Cyc.**, p. 695, n. 39, p. 699, n. 65. (4) 40 **Cyc.**, p. 754, n. 14, p. 757, n 31, 32.   (5) 40 **Cyc.**, p. 755, n. 17.   (6) 40 **Cyc.**, p. 700, n. 77.   (7) 40 ·**Cyc.**, p. 709, n. 37. (8) 15 **C. J.**, p. 27, n. 86, p. 28, n. 87.   (9, 10) 29 **Cyc.**, p. 932, n. 90.   (11) 23 **C. J.**, p. 64, n. 1, p. 74, n. 15; 40 **Cyc.**, p. 735, n. 43. (12) 40 **Cyc.**, p. 735, n. 43.   (13) 40 **Cyc.**, p. 700, n. 77, p. 716, n. 94.

APPEAL from a judgment of the Superior Court of Siskiyou County.   H. D. Gregory, Judge Presiding.   Reversed.

The facts are stated in the opinion of the court.

J. W. McCaughey, Vincent Surr and Taylor & Tebbe for Appellants.

B. K. Collier and Jos. P. McNamara for Respondent.

THOMPSON, J., *pro tem.*—This is an action to quiet title to certain rights alleged to have been acquired by prescription to seventy-five inches of the water of Grouse Creek, which is a branch of Scott River in Siskiyou County, California.   The judgment awarded plaintiff title to seventy-five inches measured under a four-inch pressure, to be used for domestic and irrigation purposes.   This was conveyed to the premises of plaintiff by means of an open ditch which has been maintained for that purpose since 1854.   The defendants were restrained from interfering with plaintiff's right or title thereto.

Plaintiff claims title by mesne conveyance to some two hundred acres of land in section 18, township 40 north, range 7, in Siskiyou County.   This land is not riparian to Grouse Creek. . Appurtenant to the land, however, is a certain irrigation ditch a mile and a half in length, two feet in width and a foot and a half in depth.   This ditch taps the water of Grouse Creek near the point where it empties into

Scott River above the premises of plaintiff. For more than fifty years plaintiff and his predecessors in title have owned the land, maintained the ditch and used the water thus conveyed to their land for mining, agricultural and domestic purposes. The amount of water which the creek and ditch contain varies greatly according to the season. In summer both are frequently dry. The ditch passes through a porous serpentine soil, and practically half the water is lost in transit by seepage and evaporation. The evidence is conflicting as to the number of acres of land actually irrigated by this means, and as to the continuousness of its use. It appears to a fair degree of certainty that plaintiff and his predecessors in title have used the ditch and water continuously when the ditch was not dry, and when required, for more than fifty years, for mining, domestic purposes and irrigation of from twenty to thirty acres of land. This use appears to have been open, notorious, adverse and with a claim of title.

One Frawley first dug and used the ditch in 1854 for mining purposes. After this mining venture it appears to have been used continuously for domestic and irrigation purposes. The witness Parker testifies to this, and claims that from ninety to a hundred acres were under cultivation. But the majority of this land was above the dwelling-house and appears to have been irrigated from the water directly from Scott River. It is doubtful whether the court is warranted in assuming that more than twenty acres of land have been continuously irrigated by means of the water from Grouse Creek ditch. The use of the water by plaintiff and his predecessors in title does not appear to have been interrupted or interfered with until Andrew Welker broke the dam in 1918. At this time plaintiff's title had fully matured.

The first claimant to plaintiff's title was a mere appropriator of the public domain; a miner of the early California type. His use and claim long antedates the presence of any claimant under defendant's chain of title. From Frawley, the miner, plaintiff's title first passed to one Wm. W. Agee, thence to Haslip by deed dated March 5, 1866, thence to Schmitt, and then to Louis Schneider, to Vaughn and finally to Andrew Witherill, the plaintiff. The first direct reference to the water rights and the ditch is in a deed of conveyance from Katherine Schneider, the widow of Louis

Schneider, to Blattner Vaughn in February, 1915, The ditch and water rights were duly assessed with the land to plaintiff's predecessors in title ever since 1894. A homestead patent was issued by the United States to Louis Schneider February 3, 1883.

The defendants claim title to the water of this creek and ditch as riparian owners of about six acres of land adjacent to Grouse Creek. They are successors to the title of Andrew Welker, the Central Pacific Railroad Company by patent dated March 14, 1896, granted pursuant to an act of Congress dated July 25, 1866; thence to J. F. Welch, to the Grouse Creek Mining Company, and finally to the defendant Latchem as lessee, for mining purposes. Latchem operated his mining project in the name of Northern California Mines Company.

The defendants claim (1) that their riparian rights are superior to the adverse title of plaintiff; (2) that the source of water rights claimed by plaintiff are within the grant of railroad lands from the United States to the Central Pacific Railroad Company; (3) that adverse possession on the part of plaintiff has not been established; (4) that seventy-five inches of water under a four-inch pressure is excessive for the necessary use of plaintiff; (5) that costs were improperly taxed against defendants, and (6) that defendants were prejudiced by a continuance of their motion for new trial, on the court's own motion, to a time when it would be deemed to be automatically denied pursuant to section 660 of the Code of Civil Procedure.

Andrew Welker, whose father was a former owner of defendant's title, testified that his father mined along Grouse Creek between 1893 and 1911, but did not resort to the ditch for water supply. It is claimed there was a division of the water of Grouse Creek ditch by agreement. In 1902 or 1903 Andrew Welker claims his father and Louis Schneider had trouble over the water; that his father went to Schneider and procured an agreement to divide the water equally. He said. "Schneider owned the water at that time. My father went over to see Billy and told him he was going up there and break the dam and turn the water down." He was then asked if he was present at that conversation, and replied that he was not. Whereupon that evidence was stricken from the record.

Defendant's claim that the water was divided by agreement is supported by evidence- that is very uncertain and unsatisfactory. The weight of evidence indicates that no such agreement was made. Welker did irrigate a few acres of land below plaintiff's ranch. In the dry season, when water was scarce, he claims to have gone to Mr. Vaughn, the then owner of plaintiff's premises, and to have obtained permission to use one-half the water from Grouse Creek. Andrew Welker was asked: "Isn't it a fact that you told Vaughn you needed a little water down on your garden, and he said if you needed some to go and take it?" To which the witness replied, "Yes, I did." This would indicate nothing more than a temporary and permissive use.

It is claimed there was an agreement with defendant's predecessor in title, Mr. Brehm, to divide the water in 1919. Upon being asked if he had not agreed to such a division, Mr. Vaughn replied, "No, no division. I can state to you the little understanding we had. Fourth of July, 1918, . . . Mr. Welker went up and broke the dam. . . . That evening they came up to my place and asked me, 'Ain't there some way you and Ande can get along with your water without quarreling with it'? . . . I says, 'There would be if Ande wanted to do what is right, and recognize my rights.' He says, 'Why don't you use all the water and wet up the field good, and let Ande take it two or three or four days, whatever it might take to wet up his garden and alfalfa, and then turn it all back to you again.' 'Well,' I says, 'if Ande wanted to do that way . . . that would be all right.' Next morning Joe and I went over to Andrew's and suggested this to him, and he agreed to it. I told him to go and turn down all the water that he thought he could by leaving me sufficient water for the house and domestic use. Which he did. . . . In possibly four or five days, he came back to my place and said 'I got my field all wet up, and I turned you back the water this morning.' I told him 'All right,' and I went on to use it probably a week or ten days. . . . He came to my place again and asked how I was getting on irrigating. I told him my field was pretty well soaked up. . . . Then he said 'I would like to wet mine up again.' And I said, 'All right, go ahead and take the water, only leave enough for domestic use.' . . . He goes and takes the water, and in two days he came back past my place and said, 'I couldn't get

that water down to my garden; the ditch dried out, and I turned it all back to you this morning.' That is the last words Mr. Andrew Welker and I ever had about the water.''

The record contains absolute denials on the part of Mr. Vaughn that he ever agreed to any permanent division of the water with Mr. Welker. The most that can be said of the agreement, appearing from the statement above quoted, is that it constituted merely a temporary, permissive use on the part of Welker.

[1] It is true that the requisites for acquiring title to water by prescription are that the use must have been open, continuous for a period of five years or more, under a claim of right, and must have been beneficial, and the taxes paid by claimant. (1 Wiel on Water Rights, No. 522, p. 628; 2 Kinney on Irrigation, No. 1048, p. 1876.) The statutory period necessary to acquire prescriptive rights need not necessarily be the five years immediately preceding the commencement of the action. In the case of *Union Mill & Mining Co.* v. *Danberg,* 81 Fed. 94, many of the priniciples involved in adverse title to water rights have been concretely stated as follows: ''It is well settled that the right to water flowing in public streams may be appropriated for a beneficial use; if it is used for irrigation the appropriator is entitled to only the amount necessary to irrigate his land; by making a reasonable use of the water; the object in view at the time of the appropriation of the water, should be considered in determining the extent and right of the water used; the quantity of water actually beneficially used, and not the capacity of the ditch or aqueduct through which it passes, will determine the title to water appropriated for irrigation, watering stock, or domestic use; one cannot acquire title to any more water than is necessary for the purpose of his appropriation; the intention of the appropriator, his object and purpose in taking the water, his acts and conduct in regard thereto, the amount and character of land owned by him, his necessities, ability and surroundings must be considered in determining and defining his rights; the rights acquired must be exercised with reference to the general condition of the country, and the needs of the community; and must be subject to any prior rights acquired.'' The foregoing principles are supported by a uniform line of

authorities in California and all the states where the question to water rights from public streams has arisen.

[2] It is equally well settled that, to acquire title to water by adverse possession, it must have been used with a claim of right, uninterrupted, and for a beneficial purpose. (*California Pastoral Co.* v. *Madera Canal & Irr. Co.*, 167 Cal. 78 [138 Pac. 718].) The extent of the user's right is limited not by the quantity of water actually diverted, nor by the capacity of the ditch but by the quantity which is applied for beneficial purposes. (*Barrows* v. *Fox*, 98 Cal. 63 [32 Pac. 811]; *Smith* v. *Hawkins*, 120 Cal. 89 [52 Pac. 139].) It is not necessary that a claimant should use the water all the hours of each day, nor every day in the year for the prescribed statutory period, in order to establish uninterrupted or continuous use; it is only necessary that he shall have used it continuously during such portions of the day or year as is required for the beneficial use to which it is applied. (1 Wiel on Water Rights, No. 583, p. 630.)

So far as the necessary elements which constitute adverse possession to water rights are concerned, the record indicates that the plaintiff and his predecessors in title have sufficiently conformed to the law. Their use of the water does not appear to have been by mere permission of any other claimants. The entire record indicates that they were constantly asserting a claim of title by all their acts and conduct.

[3] A portion of defendant's land is riparian to Grouse Creek below the point where plaintiff's ditch diverted the flow of water. It does not satisfactorily appear whether any portion of plaintiff's land is also riparian to this creek, or not. But assuming that plaintiff's land is nonriparian to this creek, and that defendant's land is riparian to it below the mouth of the diverting ditch, still it is the settled law of this state that the right to take water from a stream, as against a lower riparian owner, may be acquired by prescription. (*Arroyo Ditch Co.* v. *Baldwin*, 155 Cal. 280 [100 Pac. 874]; *Gallagher* v. *Montecito Valley Water Co.*, 101 Cal. 245 [35 Pac. 770]; *Bathgate* v. *Irvine*, 126 Cal. 144 [77 Am. St. Rep. 158, 58 Pac. 442]; *Rice* v. *Meiners*, 136 Cal. 292 [68 Pac. 817]; *Coonradt* v. *Hill*, 79 Cal. 587 [21 Pac. 1099]; *American Co.* v. *Bradford*, 27 Cal. 360; *Southern Cal. Inv. Co.* v. *Wilshire*, 144 Cal. 68 [77 Pac. 767];

*Pyramid Land Co.* v. *Scott,* 51 Cal. App. 636 [197 Pac. 398]; *Williams* v. *Costa,* 52 Cal. App. 396 [198 Pac. 1017].)

It is claimed that the evidence fails to show that the ditch or water rights in question were included in any assessment of taxes on plaintiff's property, or that such water rights appear in any of the earlier deeds of conveyance. The evidence does, however, show that the ditch and water rights were duly assessed with plaintiff's property in 1894, The earlier deeds do not refer to the ditch or water rights. [4] But in order to convey an easement in water flowing through a ditch for the purpose of irrigating land, the water rights need not be mentioned in the deed. Water diverted from a stream, and flowing through a ditch to irrigate land, or for domestic purposes, is appurtenant to the land, and is real property, and passes with the deed to the property without specifically mentioning such appurtenance. (Civ. Code, sec. 662, 9 Cal. Jur. 286; *Coonradt* v. *Hill,* 79 Cal. 587 [21 Pac. 1099]; 8 R. C. L., sec. 125, p. 1070; *Farmer* v. *Ukiah,* 56 Cal. 11; *Stanislaus Water Co.* v. *Buchman,* 152 Cal. 717 [15 L. R. A. (N. S.) 359, 93 Pac. 858].) [5] Each deed in form, in plaintiff's chain of title, contained the language conveying the real property "together with the appurtenances thereunto belonging." This was sufficient conveyance of the water rights as appurtenant to the land

[6] Extravagance in transit of the water by means of an open ditch through porous serpentine soil is charged, as well as in the mode of application of the water for irrigation purposes.

No doubt a considerable loss of water from evaporation and percolation might be saved by the use of wooden troughs or metal pipe-lines. But in determining the method to be pursued in transmitting water for irrigation a court should consider all the conditions and surrounding circumstances of the case. This open ditch has been used for conveying the water in question ever since its appropriation in 1854. It is common knowledge, of which the courts will take notice, that in the early mining days of California this was the usual method resorted to for mining and for irrigation. The more modern means of conserving water in transportation were then little used, particularly in the remote mountainous regions. The expense and labor of such modern

methods would have then been practically prohibitive. In *Middlekamp* v. *Bessemer,* 46 Colo. 102 [23 L. R. A. (N. S.) 795, 103 Pac. 280], it is said: "All irrigation canals must of necessity seep more or less along their lines, unless prevented by means other than by the exercise of ordinary diligence. . . . We do not think the time has yet come . . . when owners can be held to such high degree of diligence as to be compelled to prevent them from seeping at all." The loss of from thirty to fifty per cent of water in transportation in arid districts is not uncommon. The method of transporting the water and applying it to the land in this case was not unreasonable, under the circumstances and conditions disclosed by the evidence.

[7] Defendants claim title to the water, as riparian owners of land acquired by mesne conveyance through the Central Pacific Railroad Company, of land included within the twenty-mile grant of railroad lands on either side of its tracks, by patent from the United States dated March 14, 1896, pursuant to the act of Congress of July 25, 1866. This act of Congress was passed just one day prior to the act of that legislative body which recognized and acknowledged the prior rights of appropriators of water on the public domain for mining, irrigation or manufacturing purposes. It is claimed no reservation was made in this act of July 25, 1866, in favor of such appropriators.

The act of Congress granting railroad lands to the Central Pacific Railroad Company is found in United States Statutes at Large, volume 14, page 239, and provides in part: "It is enacted that there be, and hereby is granted to said companies . . . every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile (ten on each side) of said railroad line; and when any of said alternate sections shall be found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of, other lands designated as aforesaid, shall be selected by the companies in lieu thereof. . . ."

The very day following the preceding enactment Congress, recognizing the prior rights of individuals on the public domain passed an act found in United States Statutes at Large, volume 14, page 251, entitled, "An act granting the right of way to ditch and canal owners over public lands,

and for other purposes." The ninth section of that act provides: "Whenever by priority of possession, rights to the use of water for mining, agriculture, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and decisions of courts, the possessors and owners of such vested rights, shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed. . . . "

The custom and the decisions, even prior to the enactment of Congress recognizing these rights in California, assured the protection of such vested claims. In a number of well-considered opinions of Mr. Justice Heydenfeldt, as early as 1856, it was held that the rights of possession of water and of easements for ditches and canals on public lands would be protected. These rights were declared to be founded on the doctrine of a presumption of a grant to the appropriator. In view of the notorious occupancy by citizens of this state, in public lands and the water of public streams, used for mining, manufacturing of lumber, construction of canals and ditches, the cultivation of farms, and various industries, the government recognized their right of ownership and acquiesced in their appropriation by failure to interfere with these industries. (*Conger* v. *Weaver,* 6 Cal. 548 [65 Am. Dec. 528]; 1 Kinney on Irrigation, No. 610, p. 1060.)

In the case of *Drake* v. *Earhart,* 2 Idaho, 750 [23 Pac. 541], Chief Justice Beatty of that state said: "All the patents granted, or pre-emptions of homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches. The rulings have been uniform that the patentee of lands has no claim upon the water flowing through the same as against a prior appropriator. (*South Yuba Water Co.* v. *Rosa,* 80 Cal. 333 [22 Pac. 222].) As far back as 1855 the Supreme Court of California in *Irwin* v. *Phillips,* 5 Cal. 145 [63 Am. Dec. 113], and in *Tartar* v. *Spring Creek Water Co.,* 5 Cal. 395, distinctly held that the prior appropriator of water should hold it against the riparian claim of the owner of land through which it flowed, and also in all branches of industry the prior appropriator of land, water and easements would be protected. Not only had such be-

come the law by custom, by the legislative will and the decisions of the courts, without dissent, but the general government for many years, without protest, acquiesced in such occupation and use of its lands and waters by its citizens, while valuable properties and industries were building upon this principle.  To put the question beyond uncertainty, and to prove and adopt what already existed as the common law of the West, Congress passed the act of July 26th, 1866. . . . ''

The United States supreme court has uniformly upheld the same doctrine.  In the case of *Broder* v. *Natoma Water & Mining Co.*, 101 U. S. 274 [25 L. Ed. 790, see, also, Rose's U. S. Notes], wherein a similar contention was made, Mr. Justice Miller said: ''In reference to the lands of plaintiff held under conveyance from the Central Pacific Railroad Company, it might be a question of some difficulty whether the right was so far a vested right in that company before the passage of this act of 1866 that the latter would be ineffectual as regards these lands.  But we do not think the defendants are under the necessity of relying on that statute.  We are of the opinion that it is the established doctrine of this court that the rights of . . . persons who had constructed canals and ditches to be used in mining operations, and for purposes of agricultural irrigation in the regions where such artificial use of water was an absolute necessity, are rights which the government had by its conduct recognized and encouraged, and was bound to protect before the passage of the act of 1866, and that the section of the act quoted (section 9) was rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, rather than the establishment of a new one.  This subject has so recently received our attention, and the grounds on which this construction rests are so well set forth in the following cases, that without further comment, we will rely upon them: *Atchison* v. *Peterson,* 20 Wall. 507 [22 L. Ed. 414]; *Basey* v. *Gallagher,* 20 Wall. 670 [22 L. Ed. 452]; *Forbes* v. *Gracey,* 94 U. S. 762 [24 L. Ed. 313]; *Wyoming* v. *Colorado,* 259 U. S. 461 [66 L. Ed., at 1012, 42 Sup. Ct. Rep. 552].''

Under the foregoing authorities, regardless of whether plaintiff's land or water rights were within the twenty-mile grant of railroad lands to the Central Pacific Railroad Com-

pany, and regardless of whether that grant was made by Congress prior to its enactment recognizing the prior rights of appropriators of the public domain, the plaintiff's prior rights were bound to be protected. Plaintiff's rights were prior and superior to the riparian rights afterward acquired by defendants through the grant from the railroad company.

[8]  The costs were not improperly taxed against defendants. Plaintiff was entitled to recover his costs of suit. This is an action to quiet title to water rights alleged to have been acquired by prescription. Plaintiff's title was quieted as to at least a portion of the water claimed by him. It has been repeatedly held that the code provisions awarding costs apply to an action affecting conflicting claims of water rights. (Code Civ. Proc., sec. 1022; 7 Cal. Jur. 257; *North-ern Cal. Power Co.* v. *Waller,* 174 Cal. 377 [163 Pac. 214]; *Stimson* v. *Lemoore,* 31 Cal. App. 396 [160 Pac. 845]; *Peake* v. *Harris,* 48 Cal. App., at 380 [192 Pac. 310].)

[9]  Nor was it prejudicial error for the court, in the absence of counsel, and without opposition, to continue defendant's motion for a new trial to a time beyond the limitation within which the motion must be made under section 660 of the Code of Civil Procedure. His notice of intention was filed April 30, 1923, setting May 11th as the time for presenting the motion. Seven several continuances were had. One at the motion of defendants, five by consent of respective counsel, and finally on July 21st at the court's own motion, in the absence of counsel, it was again continued. The last continuance appears to have been inadvertently made. It does not appear that any counsel were present, although this was the regular time set by consent for the hearing of the motion. On July 14th, preceding, when respective counsel were present and consented to a continuance, the two months allowed by section 660 of the Code of Civil Procedure, had already elapsed. [10]  This record shows a lack of diligence on the part of defendants in the prosecution and presenting of their motion for new trial. They were bound to take notice of the limitation of time within which to present it. It was their duty to be present and see that it was set within statutory time. If it had been inadvertently continued by the court at a time while the right to present the motion was still alive, defendants should have moved the court to advance the matter on the calendar.

No diligence is shown on the part of defendants. They cannot complain of this inadvertence.

We now come to the consideration of defendant's final contention that seventy-five inches of water is greatly in excess of the reasonable quantity which should be allowed in this case. We think this contention must be sustained. The evidence is very conflicting as to the number of acres of land actually irrigated, and as to the quantity of water necessary. The evidence as to the number of acres actually irrigated varies from eight to eighty acres. Probably the weight of evidence may be said to support a claim that about twenty acres were actually irrigated for the purposes of raising hay, grain and garden. In addition to this, water was also required for domestic purposes in supplying four or five cows, a span of horses, a small flock of chickens and turkeys and a household composed of two members.

Grouse Creek, characteristic of these California mountain streams, was practically dry a portion of the season until the fall rains occurred. In traversing the mile and a half through a porous, serpentine soil, nearly one-half of the water was lost in transit from seepage and evaporation.

[11] In the absence of statute, the court must fix the reasonable duty of water. In this state there is no statute regulating the duty or amount of water reasonably necessary for irrigation. Many states have adopted such statutes. The term "duty of water" has been defined to mean the quantity of water necessary to properly irrigate a given tract of land. (*Hough* v. *Porter*, 51 Or. 318 [98 Pac. 1083, 102 Pac. 728].) In Idaho the statute allows one second-foot of water for fifty acres; in Nebraska, New Mexico, Oklahoma, South Dakota and Wyoming the statute allows one second-foot for seventy acres; North Dakota allows one second-foot for eighty acres, and Nevada allows three acre-feet per year for five months and one-half acre-foot in addition per month for three additional months.

[12] In the absence of statute the duty of water is usually figured in inches under a given pressure. An inch per acre is generally considered liberal. (1 Wiel on Water Rights, 523.) It is apparent there can be no exact or uniform rule for computing the duty or reasonable quantity of water for irrigation. The needs of the soil for develop-

ing plant life depend upon the properties of the soil, the climate and various other conditions.

There are three methods of measuring water in California: The miner's inch, the second-foot and the acre-foot or acre-inch. These measurements are also sometimes reduced to gallons. It would avoid much confusion if our engineers and legislature were to adopt a uniform method of measuring water. The standard miner's inch is equal to one and a half cubic feet of water per minute passing through a given orifice. (Stats. of Cal. 1901, p. 660.) A cubic foot of water equals about 7.48 gallons. In California the miner's inch represents the quantity of water that will flow in one second through a one-inch aperture in a board or planks obstructing the stream, which aperture is located four inches below the surface or head of the stream. Fifty miner's inches are equivalent to one second-foot. (King on Irrigation, 241.) There are 43,560 square feet in an acre of land. An acre-foot of water is such a quantity of water as will cover the entire acre one foot in depth. It would therefore take 43,560 cubic feet of water to constitute one acre-foot of water. Seventy-five inches of water is therefore equivalent to one and a half second-feet, or 112½ cubic feet per minute, or 841.40 gallons per minute. Since the miner's inch is equal to one and a half cubic feet per minute, the seventy-five inches of water allowed by the trial court in this case each day of twenty-four hours, during the entire twelve months of the year would supply twenty acres of land with 112½ cubic feet of water per minute, or 6,750 cubic feet per hour, or 162,000 cubic feet per day, or 4,860,-000 cubic feet per month, or 58,320,000 cubic feet per year. Reducing this quantity of water to gallons it will be necessary only to multiply these figures by 7.48, since there are that number of gallons in a cubic foot.

Since it would take 43,560 cubic feet of water to cover an acre of land one foot deep, it would require 871,200 cubic feet to furnish one acre-foot of water for twenty acres of land; 4,860,000 cubic feet per month would be equivalent to about 5.58 acre-feet per month, or 66.96 acre-feet per year. Allowing a loss of one-half of this quantity in transit by evaporation and percolation, there would still be an excessive amount to irrigate twenty acres of land, together with the use for domestic purposes.

Assuming that one second-foot of water is equivalent to about fifty miner's inches, this judgment has provided for one and a half second-feet of water to irrigate twenty acres of land, plus the necessary water for domestic purposes. Undoubtedly the trial court calculated on the basis of much more land to be irrigated. But we think the weight of evidence will not warrant a finding of more than twenty acres during the time the prescriptive rights were maturing. And again, assuming that one-half of this quantity is lost in transit, there would still be allowed three-fourths of a second-foot for twenty acres, which would be equivalent to one second-foot for 26.6 acres. This is excessive.

Compared with the statutes of other states governing the duty of water for irrigation the quantity allowed by the trial court is excessive. As we have seen, Idaho allows only one second-foot for fifty acres. Nebraska, New Mexico, Oklahoma, South Dakota and Wyoming allow only one second-foot for seventy acres; while North Dakota allows only one second-foot for eighty acres. In the case of *Gardner v. Wright,* 49 Or. 636 [91 Pac. 297], it is said: "It being shown . . . that defendant has between sixty and seventy acres of land under cultivation, including orchard, upon which good crops have been raised each year, it will be assumed that sixty inches of water is ample for defendant's irrigation and domestic purposes."

The amount of water allowed by the judgment is clearly excessive in view of the rule that one may acquire by prescription only such quantity as has been actually, necessarily and beneficially used by the claimant for the statutory period of time.

[13] It also appears without contradiction that plaintiff did not require or use any of the water for irrigation purposes from November to April or May. In other words, there was a part of each year during which the plaintiff did not actually take or use any part of this water from Grouse Creek ditch for necessary irrigation purposes. It follows that during such portion of the year he therefore could have acquired no prescriptive right to the water. The judgment has erroneously quieted title to seventy-five inches of water the year round without regard to those months during which it was not in fact used. To this extent the judgment is not supported by the evidence. In *Northern California*

*Power Co.* v. *Flood,* 186 Cal., at 306 [199 Pac. 317], it is said: "The value of the water for irrigation is too great in this state to allow a land owner to gain a right thereto . . . by using the same for only half, or any other portion of the time less than the whole." It is there held that one may acquire prescriptive right to water for the period of time only during which it is actually beneficially used. (*Pabst* v. *Finmand,* 190 Cal. 124 [211 Pac. 11].)

For the reason that the judgment allows an excessive quantity of water and that it is not confined to those months during which it was actually and necessarily used for beneficial purposes, the cause must be remanded. The judgment is therefore reversed.

Plummer, J., and Finch, P. J., concurred.