## JENNISON *v.* KIRK.

1. The ninth section of the act of Congress of July 26, 1866, "granting the right of way to ditch and canal owners over the public lands, and for other purposes," enacted, "that whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals, for the purposes aforesaid, is hereby acknowledged and confirmed: *Provided, however,* that whenever, after the passage of this act, any person or persons shall, in the construction of any ditch or canal, injure or damage the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage." *Held,* 1. That this section only confirmed to the owners of water-rights and of ditches and canals on the public lands of the United States the same rights which they held under the local customs, laws, and decisions of the courts, prior to its passage. 2. That the proviso conferred no additional rights upon the owners of ditches subsequently constructed, but simply rendered them liable to parties on the public domain whose possessions might be injured by such construction.

2. The origin and general character of the customary law of miners stated and explained.

3. By that law, the owner of a mining claim and the owner of a water-right in California hold their respective properties from the dates of their appropriation, the first in time being the first in right; but where both rights can be enjoyed without interference with or material impairment of each other, the enjoyment of both is allowed.

4. By that law, a person cannot construct a ditch to convey water across the mining claim of another, taken up and worked according to that law before the right of way was acquired by the ditch owner, so as to prevent the further working of the claim in the usual manner in which such claims are worked, nor so as to cut off the use of water previously appropriated by the miner for working the claim, or for other beneficial purposes.

5. Accordingly, where the owner of a mining claim worked by the method known as "the hydraulic process," cut and washed away a portion of a ditch so as to let out the water flowing in it, the ditch having been so con-

structed across the claim previously acquired as to prevent it from being further worked by that method, and to prevent the use of water previously appropriated by him, — *Held*, that the cutting and washing away of the ditch, it having been done in order that the claim might be worked and the water used as before, was not an injury for which damages could be recovered.

ERROR to the Supreme Court of California.

The facts are stated in the opinion of the court.

*Mr. B. F. Myres* for the plaintiff in error.

No one appearing for the defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

In 1873, the plaintiff's testator constructed a ditch or canal in Placer County, California, to convey the waters of a cañon and of tributary and intermediate streams to a mining locality known as Georgia Hill, distant about seventeen miles, for mining, milling, and agricultural purposes, and for sale. The ditch was completed in December of that year, and immediately thereafter the waters of the cañon were turned into it. The ditch had a capacity to carry a thousand inches of water, and it is alleged that during the rainy season of the year in California, which extends from about the 1st of November to the 1st of April, the cañon, tributaries, and intermediate streams would supply that quantity, and during the dry season not less than one hundred inches. The intention of the testator, as declared on taking the initiatory steps for their appropriation, wäs to divert two thousand inches of the waters, by means of a flume and ditch.

In its course to Georgia Hill, the ditch crossed a gulch or cañon in the mountains known as Fulweiler's Gulch, the waters of which had been appropriated some years before by the defendant, who had constructed ditches to receive and convey them to a reservoir, to be used as needed. One of these ditches in the gulch was intersected by the ditch of the testator, and the waters which otherwise would have flowed in it were diverted to his ditch. The defendant thereupon repaired and reopened his own ditch, turning into it the waters which had previously flowed in it, and in so doing cut and washed away a portion of the ditch of the testator, as to let out the waters

brought down from the cañon above and the intermediate streams. It is for alleged damages thus caused to the testator, and to restrain the 'continuance of the alleged injury to his ditch, and any interference with its use, that the present action was brought.

The defendant not only justified the cutting of the testator's ditch in the manner stated, because necessary for the repair and reopening of his own ditch, and to retain the waters of the gulch previously appropriated and used by him,. but on the further ground that the ditch of the testator traversed mining claims owned many years before by him, or those through whom he derived his interest, and would prevent their being successfully worked.

It appears from the answer, which the court finds to be correct in this particular, that for many years prior to this action the defendant, or his grantors and predecessors in interest, had been in the possession of a portion of Fulweiler's Gulch, ex tending from a point about twelve hundred feet below the crossing of the testator's ditch to a point about twelve hundred feet above it, including the bed of the gulch and fifty feet of its banks, on each side ; that during this period the ground was continuously held and worked for mining purposes, and as a mining claim, in accordance with the usages, customs, and laws of miners in force in the district ; that in working the claim and extracting the gold the method employed was what is termed " the hydraulic process," by which a large volume of water is thrown with great force through a pipe or hose upon the sides of the hills, and the gold-bearing earth and gravel are washed down, and the gold so loosened that it can be readily separated ; and that the ditch of the testator traversed the immediate front and margin of this gold-bearing earth and gravel, rendering the same inaccessible from the outlets of the gulch, down which they would be washed, thus practically destroying, if allowed to remain, the working of the mining ground.

On the argument, it was admitted that the defendant's right of way for his ditch was superior to the testator's right of way for the one owned by him, being earlier in construction, and the waters of the gulch being first appropriated ; and, therefore, that the duty rested upon the testator, and since his death

upon his executor, to so adjust the crossings of the ditches as not to interfere with the full use and enjoyment, by the defendant, of his prior right. It was contended that such crossings had been so adjusted by the testator, but were destroyed by the defendant.

It was also admitted that the extension of .the testator's ditch, at the place where it was constructed across the claim of the defendant, prevented the successful working of the claim ; but as the land qver which the ditch passed, and on which the claim is situated, is a portion of the public domain of the United States, it was contended that the right of way for the ditch was superior to the right to work the claim ; and that such superior right was conferred by the ninth section of the act of Congress of July 26, 1866. . That section enacted, —  .

" That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same ; and the right of way for the construction of ditches and canals, for the purposes aforesaid, is hereby acknowledged and confirmed : *Provided, however,* that whenever, after the passage of this act, any person or persons shall, in the construction of any ditch or canal, injure or damage the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage." 14 Stat., 253.

There are some verbal changes in the section as re-enacted in the Revised Statutes, but none affecting its substance and meaning. Rev. Stat., sect. 2339.  '

The position of the plaintiff's counsel is, that of the two rights mentioned in this section, only the right to the use of water on the public lands, acquired by priority of possession, is dependent upon local customs, laws, and decisions of the courts ; and that the right of way over such lands for the construction of ditches and canals is conferred absolutely upon those who have acquired the water-right, and is not subject in its enjoyment to the local customs, laws, and decisions. This position, we think, cannot be sustained. The object of the section was

to give the sanction of the United States, the proprietor of the lands, to possessory rights, which had previously rested solely upon the local customs, laws, and decisions of the courts, and to prevent such rights from being lost on a sale of the lands. The section is to be read in connection with other provisions of the act of which it is a part, and in the light of matters of public history relating to the mineral lands of the United States. The discovery of gold in California was followed, as is well known, by an immense immigration into the State, which increased its population within three or four years from a few thousand to several hundred thousand. The lands in which the precious metals were found belonged to the United States, and were unsurveyed, and not open, by law, to occupation and settlement. Little was known of them further than that they were situated in the Sierra Nevada mountains. Into these mountains the emigrants in vast numbers penetrated, occupying the ravines, gulches, and cañons, and probing the earth in all directions for the precious metals. Wherever they went, they carried with them that love of order and system and of fair dealing which are the prominent characteristics of our people. In every district which they occupied they framed certain rules for their government, by which the extent of ground they could severally hold for mining was designated, their possessory right to such ground secured and enforced, and contests between them either avoided or determined. These rules bore a marked similarity, varying in the several districts only according to the extent and character of the mines; distinct provisions being made for different kinds of mining, such as placer mining, quartz mining, and mining in drifts or tunnels. They all recognized discovery, followed by appropriation, as the foundation of the possessor's title, and development by working as the condition of its retention. And they were so framed as to secure to all comers, within practicable limits, absolute equality of right and privilege in working the mines. Nothing but such equality would have been tolerated by the miners, who were emphatically the law-makers, as respects mining, upon the public lands in the State. The first appropriator was everywhere held to have, within certain well-defined limits, a better right than others to the claims taken up; and in all contro-

versies, except as against the government, he was regarded as the original owner, from whom title was to be traced. But the mines could not be worked without water. Without water the gold would remain for ever buried in the earth or rock. To carry water to mining localities, when they were not on the banks of a stream or lake, became, therefore, an important and necessary business in carrying on mining. Here, also, the first appropriator of water to be conveyed to such localities for mining or other beneficial purposes, was recognized as having, to the extent of actual use, the better right. The doctrines of the common law respecting the rights of riparian owners were not considered as applicable, or only in a very limited degree, to the condition of miners in the mountains. The waters of rivers and lakes were consequently carried great distances in ditches and flumes, constructed with vast labor and enormous expenditures of money, along the sides of mountains and through cañons and ravines, to supply communities engaged in mining, as well as for agriculturists and ordinary consumption. Numerous regulations were adopted, or assumed to exist, from their obvious justness, for the security of these ditches and flumes, and the protection of rights to water, not only between different appropriators, but between them and the holders of mining claims. These regulations and customs were appealed to in controversies in the State courts, and received their sanction ; and properties to the value of many millions rested upon them. For eighteen years — from 1848 to 1866 — the regulations and customs of miners, as enforced and moulded by the courts and sanctioned by the legislation of the State, constituted the law governing property in mines and in water on the public mineral lands. Until 1866, no legislation was had looking to a sale of the mineral lands. The policy of the country had previously been, as shown by the legislation of Congress, to exempt such lands from sale. In that year the act, the ninth section of which we have quoted, was passed. In the first section it was declared that the mineral lands of the United States were free and open to exploration and occupation by citizens of the United States, and those who had declared their intention to become citizens, subject to such regulations as might be prescribed by law and the local customs or rules of

miners in the several mining districts, so far as the same were not in conflict with the laws of the United States. In other sections it provided for acquiring the title of the United States to claims in veins or lodes of quartz bearing gold, silver, cinnabar, or copper, the possessory right to which had been previously acquired under the customs and rules of miners. In no provision of the act was any intention manifested to interfere with the possessory rights previously acquired, or which might be afterwards acquired; the intention expressed was to secure them by a patent from the government. The senator of Nevada, Hon. William M. Stewart, the author of the act, in advocating its passage in the Senate, spoke in high praise of the regulations and customs of miners, and portrayed in glowing language the wonderful results that had followed the system of free mining which had prevailed with the tacit consent of the government. The legislature of California, he said, had wisely declared that the rules and regulations of miners should be received in evidence in all controversies respecting mining claims, and, when not in conflict with the Constitution or laws of the State or of the United States, should govern their determination; and a series of wise judicial decisions had moulded these regulations and customs into " a comprehensive system of common law, embracing not only mining law, properly speaking, but also regulating the use of water for mining purposes." The miner's law, he added, was a part of the miner's nature. He had made it, and he trusted it and obeyed it. He had given the honest toil of his life to discover wealth, which, when found, was protected by no higher law than that enacted by himself, under the implied sanction of a just and generous government. And the act proposed continued the system of free mining, holding the mineral lands open to exploration and occupation, subject to legislation by Congress and to local rules. It merely recognized the obligation of the government to respect private rights which had grown up under its tacit consent and approval. It proposed no new system, but sanctioned, regulated, and confirmed a system already established, to which the people were attached. Cong. Globe, 1st Sess., 39th Cong., part iv., pp. 3225–3228.

These statements of the author of the act in advocating its

adoption cannot, of course, control its construction, where there is doubt as to its meaning; but they show the condition of mining property on the public lands of the United States, and the tenure by which it was held by miners in the absence of legislation on the subject, and thus serve to indicate the probable intention of Congress in the passage of the act.

Whilst acknowledging the general wisdom of the regulations of miners, as sanctioned by the State and moulded by its courts, and seeking to give title to possessions acquired under them, it must have occurred to the author, as it did to others, that if the title of the United States was conveyed to the holders of mining claims, the right of way of owners of ditches and canals across the claims, although then recognized by the local customs, laws, and decisions, would be thereby destroyed, unless secured by the act. And it was for the purpose of securing rights to water, and rights of way over the public lands to convey it, which were thus recognized, that the ninth section was adopted, and not to grant rights of way where they were not previously recognized by the customary law of miners. The section purported in its first clause only to protect rights to the use of water for mining, manufacturing, or other beneficial purposes, acquired by priority of possession, when recognized by the local customs, laws, and decisions of the courts; and the second clause, declaring that the right of way for the construction of ditches and canals to carry water for those purposes " is acknowledged and confirmed," cannot be construed as conferring a right of way independent of such customary law, but only as acknowledging and confirming such right as that law gave. The proviso to the section conferred no additional rights upon the owners of ditches subsequently constructed: it simply rendered them liable to parties on the public domain whose possessions might be injured by such construction. In other words, the United States by the section said, that whenever rights to the use of water by priority of possession had become vested, and were recognized by the local customs, laws, and decisions of the courts, the owners and possessors should be protected in them; and that the right of way for ditches and canals incident to such water-rights, being recognized in the same manner, should be " acknowledged and confirmed; "

but where ditches subsequently constructed injured by their construction the possessions of others on the public domain, the owners of such ditches should be liable for the injuries sustained. Any other construction would be inconsistent with the general purpose of the act, which, as already stated, was to give the sanction of the government to possessory rights acquired under the local customs, laws, and decisions of the courts.

This view of the object and meaning of the ninth section was substantially taken by the Supreme Court of California in the present case; it was adopted at an early day by the Land Department of the government, and the subsequent legislation of Congress respecting the mineral lands is in harmony with it. Letter of Commissioner Wilson of Nov. 23, 1869; Copp's U. S. Mining Decisions, 24; Acts of Congress of July 9, 1870, and May 10, 1872, Rev. Stat., tit. 32, c. 6.

By the customary law of miners in California, as we understand it, the owner of a mining claim and the owner of a water-right enjoy their respective properties from the dates of their appropriation, the first in time being the first in right; but where both rights can be enjoyed without interference with or material impairment of each other, the enjoyment of both is allowed. In the present case, the plaintiff admits that it was incumbent upon the testator or himself to so adjust the crossing of the two ditches that the use of the testator's ditch should not interfere with the prior right of the defendant to the use of the water of the gulch; and it would seem that, so far as the flow of the water was concerned, this was done. Had there been nothing further in the case, the claim of the plaintiff would have been entitled to consideration. But there was much more in the case. The chief value of the water of the gulch was to enable the defendant to work his mining claim by the hydraulic process. The position of the testator's ditch prevented this working, and thus deprived him of this value of the water, and practically destroyed his mining claim. No system of law with which we are acquainted tolerates the use of one's property in this way so as to destroy the property of another. The cutting and washing away of a portion of the testator's ditch by the defendant, this having been done "in

the exercise, use, and enjoyment of his own water-rights, in the usual and in a reasonable manner," as found by the court, and in order that his claim might be worked as before, was not, therefore, an injury for which damages could be recovered.[1]

*Judgment affirmed.*

[1] The customary law of miners, as stated in the opinion, is not applicable in California to controversies arising between them, or ditch owners, and occupants of the public lands for agricultural or grazing purposes. It has been the general policy of the State " to permit settlers in all capacities to occupy the public lands, and by such occupation to acquire the right of undisturbed enjoyment against all the world but the true owner." *Tartar* v. *Spring Creek Co.*, 5 Cal. 398. But at an early day an exception was made to this policy in cases where the interests of agriculturists and of miners conflicted. By an act passed April 20, 1852, a right of action was given to any one settled upon the public lands for the purpose of cultivating or grazing against parties interfering with his premises, or injuring his lands where the same were designated by distinct boundaries, and did not exceed one hundred and sixty acres in extent; with a proviso, however, that if the lands contained mines of precious metals, the claim of the occupant should not preclude any persons desiring to do so from working the mines " as fully and unreservedly as they might or could do had no possession or claim been made for grazing or agricultural purposes." Stat. 1852, p. 158.

Under this act the Supreme Court of the State held that miners, for the purpose simply of mining, could enter upon the land thus occupied, but that the act legalized what would otherwise have been a trespass, and could not be extended by implication to a class of cases not specially provided for. Accordingly, ditches constructed over lands thus held, without the consent of the occupant, though designed to convey water to mining localities for the purpose of mining, were held to be nuisances, and upon the complaint of the occupant were ordered to be abated. *Stoakes* v. *Barrett*, 5 Cal. 37; *McClinton* v. *Bryden*, id. 97; *Fitzgerald* v. *Urton*, id. 308; *Burge* v. *Underwood*, 6 id. 46; *Wermer* v. *Lowery*, 11 id. 104.

Since these decisions, there has been some legislation in the State, permitting water to be conveyed, upon certain conditions, across the lands of others. Such legislation, if limited to merely regulating the terms upon which possessory rights subsequently acquired on the public lands in the State may be enjoyed in the absence of title from the United States, may not be open to objection.