[Civ. No. 4034. Third Appellate District.—October 24, 1930.]

MT. SHASTA POWER CORPORATION (a Corporation), Plaintiff and Appellant, v. RODERICK McARTHUR et al., Defendants and Appellants.

Wm. B. Bosley, Jones & Dall, Chenoweth & Leininger, Athearn, Chandler & Farmer and Frank R. Devlin for Plaintiff and Appellant.

Jesse W. Carter and Annette Abbott Adams for Defendants and Appellants.

MR. JUSTICE THOMPSON (R. L.), DELIVERED THE OPINION OF THE COURT.—From a decree apportioning and quieting title in the respective parties to a quantity of river water for irrigation and power purposes, each party has appealed.

This action involves both prescriptive and riparian rights to the waters of Pit, Fall and Tule Rivers acquired for power purposes and for the benefit of lands adjacent to the confluence of these non-navigable streams.

The Pit River, which has its source in Goose Lake in northeastern California, flows in a southwesterly direction to its confluence with Fall River at a point north of Redding in Shasta County. Fall River rises in Siskiyou County and flows southeasterly to join the Pit River. The Tule River rises in Trout Lake, Shasta County, flowing southerly through a flat tule country, emptying into Fall River several miles north of its junction with Pit River. The village of Fall River Mills is situated at the confluence of Fall and Pit Rivers.

The plaintiff is engaged in the enterprise of producing and marketing hydro-electric power for use as heat and light. For this purpose it acquired and owns large tracts of lands adjacent to the Pit and Fall Rivers above the confluence thereof. Included in the plaintiff's holdings are numerous tracts of lands consisting of about 14,000 acres, previously owned by Scott McArthur, a former party defendant in this suit, from whom title was acquired subsequent to the commencement of this action. The cause against him was then dismissed. After procuring from the California Railroad Commission a finding of public necessity therefor, the plaintiff constructed and thereafter maintained at a point a short distance above Manning Falls on the Fall River, which location is a few miles above the junction of Pit and Fall Rivers, a hydro-electric power plant consisting of buildings and machinery, a diverting dam, canal, tunnels, surge-chamber and waterway, penstock and apparatus. The carrying capacity of the canal, tunnel and penstock was 1800 cubic feet of water per second, which is in excess of the entire normal flow of Fall River.

John A. McArthur, who was the father of the defendants and of their brother Scott, settled upon the banks of Pit River as early as 1875. He thereafter acquired all of the lands owned by the defendants which are involved in this suit and which border on Pit, Fall and Tule Rivers. The home ranch was located on the south bank of Pit River two miles above its confluence with Fall River. In the course of 20 years John McArthur constructed some 16 miles of dikes along the borders of Tule River and Trout Lake, together with many miles of canals and ditches, by means of which several thousand acres of swamp-land intervening between Pit and Tule Rivers were drained and reclaimed.

The main canal was 40 feet wide and 18 feet in depth extending for a distance of four miles from the north bank of Pit River opposite the McArthur home place in a northwestern direction to Tule River. This canal severed the divide which separated the Pit River watershed from the Fall River watershed. After draining and reclaiming this vast tule tract, John McArthur irrigated it by means of a dam across Fall River at Manning Falls, thus backing up the water of Fall River until it flowed into the canal and ditches through gates and supplied a considerable portion of the tract. In this manner he used to advantage much of this tule land for grazing purposes. Subsequently he extended the use of the 40-foot canal above mentioned by impounding the water on the north bank of Pit River and conveying it across the stream by means of a pipe-line. In this manner he irrigated 542 acres of the home place on the south side of the river.

January 18, 1902, John McArthur posted notices therefor and appropriated 100,000 inches of water from Fall River, measured under a four-inch pressure, to be used for power, domestic and irrigation purposes on his lands in townships 37 and 38, north of ranges 4, 5 and 6 east, M. D. M., to be diverted by means of gates and dams at Manning Falls. January 21, 1902, he further appropriated in the same manner from Tule River 80,000 inches of water for use on his lands in section 16, township 37, north of range 5 east, M. D. M., to be diverted and transported to the land through the 40-foot canal above mentioned. A quantity of water was adversely used in this manner for more than five years and title was thus acquired.

In 1906, John McArthur organized a family corporation, 500 shares of which were issued and distributed among his sons and daughters. All of his agricultural lands and water rights were conveyed to this corporation, with the exception of the home place. In 1908 he died, leaving the home ranch to his wife Catherine. She died in 1917. The children inherited the home place in equal shares. In 1919 the corporation was dissolved and the assets were distributed to the children pursuant to a written agreement which was duly executed by all of the shareholders of the corporation. By means of deeds of conveyance from the several children, the defendant Luther McArthur became sole owner of the home

place. Scott McArthur became the sole owner of the swamp-lands, which, on December 11, 1924, he conveyed to the plaintiff.

September 24, 1919, Scott and Anna McArthur executed a quitclaim deed to the defendant Roderick McArthur, to "the right to use all of the water which flows through a 30-inch pipe, under a four-foot pressure, from that certain ditch or canal beginning at the diversion gates of the Tule river". October 30, 1919, the same grantors executed a similar quitclaim deed to Frank, Luther, Roderick, Anna McArthur and Victoria Cadwallader for the use of a like quantity of water, from the same source. The language conveying this water is identical with that of the previous deed. November 6, 1920, Scott and Anna McArthur executed to Luther McArthur a similar quitclaim deed to the use of a like amount of water from the same source. The trial court held that these quitclaim deeds merely confirmed water rights previously acquired by the respective grantees, and conferred no title to additional water. From that portion of the judgment which is based upon this finding, the defendants have appealed.

The court found that the respective defendants had acquired prescriptive title by adverse use to the several allotments of water hereinafter specified, to be taken from the Tule River and measured at the diverting point therefrom. The plaintiff has appealed from that portion of the judgment and seeks a reversal on the grounds that each separate allotment is excessive and is unsupported by the evidence. These awards are as follows:

To Roderick McArthur the court allowed 21 cubic feet of water per second for 48 hours of each period of ten days from March 15th to October 15th of each year for the purpose of irrigating 63 acres of land adjacent to Pit River; also two additional cubic feet of water per second flowing continuously night and day throughout the year for the purpose of irrigating six acres of land and for fire protection of the buildings situated in the town of McArthur on the south bank of Pit River; also 10 additional cubic feet of water per second flowing continuously throughout the year for the purpose of operating a power plant for generating heat and light and for a pumping plant.

To Luther McArthur the court allowed 33½ cubic feet of water per second flowing continuously from March 15th to October 15th of each year for the purpose of irrigating 542 acres of land, constituting the home place, which is situated on the south side of the Pit River; also 10 additional cubic feet of water per second flowing continuously from October 15th to March 15th of each year for the purpose of watering stock.

To Roderick and Luther McArthur jointly the court allowed 10.65 additional cubic feet of water per second flowing continuously from March 15th to October 15th of each year, on account of the loss of water by seepage and evaporation in transporting it from Tule River through the McArthur canal for the foregoing purposes.

The court then found that the plaintiff was the owner of the power plant and lands described in the complaint, together with the tule lands which were acquired from Scott McArthur, and that it was entitled to a continuation of the natural flow of the waters of Tule River into Fall River, and to appropriate, divert and use all of the water of Fall River for irrigating its lands and operating its power plant, subject to the defendants' title to the foregoing allotments of water to them for the purposes mentioned and subject to any rights to water beneficially acquired by other upper riparian owners of land, provided that "all water used by the plaintiff in the operation of its power plant shall be returned to the Pit River before it leaves the properties of the plaintiff".

The plaintiff asserts that the award to the defendant Luther McArthur of 33½ cubic feet of water per second from March 15th to October 15th of each year to irrigate 542 acres of land is excessive, wasteful and unsupported by the evidence; that that quantity of water does not appear to have been actually, necessarily and beneficially used continuously during the statutory period of the years which is necessary to confer prescriptive title thereto; that the findings of the court are in irreconcilable conflict with respect to the continuous use of that quantity of water.

Respecting the duty, as that term is technically used, or the quantity of water which is necessarily required for irrigating agricultural land, it ordinarily becomes a question of fact to be determined by the trial court, within an exer-

cise of sound reason, which is governed largely by the nature of the soil, climatic conditions and circumstances surrounding the tract involved and the use to which it is applied. In the case of *Joerger* v. *Pacific Gas & Elec. Co.*, 207 Cal. 8 [276 Pac. 1017, 1024], it is said: ·

"In this state there is no statute which definitely regulates the duty or amount of water reasonably necessary for irrigation. This being so, the question becomes one of fact for the court, in a given case, to determine upon the evidence presented to it. The question of what *quantum* of water is reasonably required for irrigation is necessarily a complicated one, depending as it does upon many different conditions. . . . There can be no question, therefore, that an acquired right in waters is limited to the amount that is reasonably necessary for the beneficial purpose for which it is diverted, and no title can be acquired to that part of a diversion which is excessive of such needs. In so far as the diversion exceeds such reasonably necessary amount it is contrary to the policy of the law and is a taking without right and confers no title no matter for how long continued. . . . Defendants assert that . . . no decree has ever been upheld awarding more than one miner's inch per acre. This may be true and yet such circumstance is not controlling, for this court cannot fix a limit beyond which a trial court may or may not go, or say, as a matter of law, that the amount allowed is excessive irrespective of the evidence. As above stated, the amount of water necessary for beneficial use is a question of fact in each particular case.

█ The foregoing language is peculiarly applicable to the present case. It seems to answer the plaintiff's contention that 33½ cubic feet of water per second which was awarded the defendant Luther McArthur is excessive or wasteful. These were questions of fact for the determination of the trial court. Moreover, there is evidence to support the defendants' claim that the nature of the soil, the surrounding conditions and the character of their irrigation system required more water than an amount which might suffice under other and ordinary circumstances.

There is evidence to support the finding of the court that "the climate in that part of California where defendants' lands are situated is very dry and the annual rainfall is very slight". The soil is porous. The surface of the land is

somewhat rough, sloping and irregular. ▆ The irrigation system which was in use consisted of what is termed the contour check or pondage system. The water is supplied to small areas throughout the ranch partially inclosed by artificial checks or miniature dikes of earth into which inclosures the water is furnished under pressure by means of a pipe-line through various valves. This irrigation system may be primitive and wasteful as compared with more modern methods of irrigating. The judgment, however, may not be disturbed on that account. The Joerger case, *supra,* also settles this controversy. It is there said:

"Nor is there merit in the claim that the method employed by plaintiff in diverting the water is unauthorized. . . . The ground is hilly and porous, marked by numerous depressions, and is irrigated by turning the water upon the ground and permitting it to run over the slopes. This is the character of system commonly used in the vicinity. There is no authority which requires an appropriator of water to change his system of irrigation so that others may perhaps be benefited thereby, assuming that the method may produce some waste."

▆ The plaintiff contends there is a lack of evidence to support the finding of the court to the effect that Luther Mc-Arthur had appropriated and used 33½ cubic feet of water per second *continuously flowing* through the canal and over and upon the 542-acre tract of land, and that this finding is in irreconcilable conflict with a subsequent finding of the court that "in the operation of said irrigation system in the manner herein specified the entire flow of 33½ cubic feet per second *is not in use continuously in the irrigation of said land,* but it is necessary to maintain a constant flow of 33½ cubic feet per second of water at the head of said pipe line. . . . "

Both expert and nonexpert witnesses were called by the respective parties. The pipe-line extending from the canal across the Pit River over and upon this 542-acre tract is supplied by means of six several valves or outlets along its course for the purpose of distributing the water to the various fields or ponds. These valves were not all opened at the same time, but only when and where the water was in present use. Elaborate tables of the result of actual measurements of water from these several valves appear in evidence. These measurements were taken once a day over a

period of time. These tables indicate a variance in the actual amount of water which flowed from the valves on different occasions. Sometimes the flow was less than 33½ cubic feet per second and sometimes it exceeded that amount slightly. The figures and testimony, however, indicate that the canal and pipe-line actually diverted from the Tule River and carried the full 33½ cubic feet of water per second to which the defendant Luther McArthur claims prescriptive title and which amount was awarded to him. It would be arduous and useless to extend this opinion by the quotation of evidence to the unwarranted length necessary to prove this conclusion. The record consists of 2,500 pages of evidence. It is sufficient to say there appears to be substantial evidence to support this conclusion.

Nor do we think the finding to the effect that the pipe-line has a capacity and for five consecutive years has conveyed to the 542-acre tract 33½ cubic feet of water per second, which has been necessarily and beneficially used thereon for irrigation purposes, is in conflict with the subsequent finding that that amount of water "is not in use continuously in the (actual) irrigation of said land". The court further found in this regard, and there is substantial evidence to support the finding, that "it is necessary to maintain a constant flow of 33½ cubic feet per second of water at the head of said pipe line during the entire irrigation season . . . " in order to operate the irrigation system, so as to obtain that specified amount at any of the valves along the pipe-line when water was required; to prevent the sucking of air in the pipes and the consequent collapse thereof and to keep the pipes clear of sediment and debris. The actual constant distribution of the entire maximum amount of water allowed is not necessarily required to be deposited on the land. It is necessary that the entire amount allowed shall have been actually, continuously and beneficially used by the claimant for the statutory period of five years in order to acquire prescriptive title thereto. (*Witherill* v. *Brehm*, 74 Cal. App. 286, 302 [240 Pac. 529].) But if the water is so used as a necessary incident to the irrigation of the land, it sufficiently fulfills the requirements of law above quoted. It follows that if the 33½ cubic feet of water has been necessarily used to maintain a head adequate to distribute a less quantity of water for necessary and beneficial use along the

pipe-line, which is furnished with various valves to supply different fields in the tract of land, it fulfills the mandate of law even though a much less quantity ultimately reaches the soil in the process of irrigation.

Thirty-three and a half cubic feet of water per second seems to be a liberal allowance for the irrigation of 542 acres of land under ordinary conditions. Irrigation devices more modern than the primitive systems which were used in the pioneer days of California may eventually become necessary to supply a growing population and an increased demand for water, to prevent unnecessary waste and to conserve an economical use thereof. The latest expression of the Supreme Court, however, which is found in the Joerger case, *supra,* indicates that time has not yet arrived. No absolute limitation with respect to the duty required in the use of water for irrigation and domestic purposes is fixed by legislative enactment or the decisions of our courts. No special method of irrigation is required. No particular device or system is prescribed. These features with relation to water litigation are deemed to be questions of fact for the reasonable determination of the trial court.

Ten additional cubic feet of water per second were awarded to Luther McArthur for watering stock on the home place from October 15th to March 15th each year, during which period of time no water was allowed for irrigation purposes. We are of the opinion there is substantial evidence to support this allowance.

The evidence indicates that Luther McArthur kept from 400 to 1200 head of stock. This allowance of water was to be taken from the point of the Tule River diversion. It is conveyed through the open canal a distance of five miles, thence through the pipe-line for more than 3,000 feet and by means of an open hillside ditch some two miles farther. The tule land soil through which the canal ran was permeated with alkali. There was a considerable loss of water in transportation. A steady stream of water through the pipe-line and open ditch may be necessary to purify the water and to prevent it from freezing in the pipes during the winter season. Although the season is variable during which freezing weather prevails and the herd is not uniform as to the exact number of cattle with which it is comprised, still, under the circumstances of this case, both the quantity

of water and the period during which it is allowed are questions of fact, the determination of which may not be disturbed on appeal.

The court found that 21 cubic feet of water per second flowing for 48 hours during each 10-day period from March 15th to October 15th of each year had been appropriated and used by Roderick McArthur to irrigate 63 acres of land bordering on the north bank of the Pit River opposite the home ranch; that he had acquired in a similar way 10 additional cubic feet of water per second flowing continuously throughout the year to operate a hydro-electric generating plant and to maintain a pumping plant by means of which he conveyed two additional cubic feet of water per second flowing continuously the year round through a pipeline to irrigate six other acres of land in a field remote from the 63-acre tract. But it was further found that the 10 cubic feet of water per second used to operate the power plant was subsequently wasted by discharging it into Pit River and that it must be saved and contributed toward the amount of water which is allowed to irrigate the 63-acre tract. These several amounts of water were accordingly awarded to Roderick McArthur for the purposes mentioned. We are unable to say any of these awards are excessive as a matter of law. For the same reasons previously assigned with respect to the allotment of water to Luther McArthur we are impelled to affirm these several allowances to Roderick. A method of contour check or pondage system of irrigating these last-mentioned tracts was maintained similar to that which was used on the 542-acre home ranch. The climatic conditions and the character of the soil were the same with respect to all the land involved.

Discrepancies exist between the figures supplied by the plaintiff and those of the defendants regarding the measurement of the water which was actually consumed. Every reasonable construction of the evidence adduced, however, should obtain with a view to supporting the judgment. We think the evidence is adequate to sustain these allowances.

A further award to Luther and Roderick jointly of 10.65 cubic feet of water per second throughout the irrigation season from March 15th to October 15th of each year on account of seepage and evaporation is also challenged by the plaintiff. The summers are hot, the soil is porous and

the water is conveyed a great distance through an open canal and ditches. It stands in ponds on somewhat rough and sloping fields. We are of the opinion this allowance was therefore not excessive. (Kinney on Irrigation and Water Rights, 2d ed., p. 1601.)

Finally the plaintiff contends the measurements for the allowance of water to the defendants should have been effective at the end of the canal where it reaches the bank of Pit River, and not at the point of the Tule River diversion. It is asserted this canal across the tule land, the entrance to which was fixed by the court as the point of diversion of the waters to which the defendants are entitled, was constructed for the purpose of draining and reclaiming the swamp-land and that the defendants may not complain so long as they obtain the full amount of water to which they are entitled. In support of this assertion the plaintiff relies upon the case of *Wiggins* v. *Muscupiabe L. & W. Co.*, 113 Cal. 182, 195 [54 Am. St. Rep. 337, 32 L. R. A. 667, 45 Pac. 160], where it is said:

"The plaintiff could under no circumstances be entitled to the use of more water than would reach his land by the natural flow of the stream, and if he receives this flow upon his land, it is immaterial to him whether it is received by means of the natural course of the stream or by artificial means."

In the case last cited only the quantity of the water which was necessary for irrigation purposes was involved. It is undoubtedly true that when one is entitled to a specified amount of water at a certain place without regard to its quality, he may not complain of the mere means of transportation so long as his enjoyment of the use of the water for the purposes for which its title was acquired is not restricted. In the present case, however, one of the essential purposes for which the defendants used the water was to water their stock. It was claimed by the defendants the water of the Tule River was purer and more suitable for watering stock than that which came from Trout Lake, Mud Lake or the swamp water from the numerous lateral tule ditches in the vicinity.

By appropriating and using water from Tule River by means of the McArthur canal for the prescriptive length of time, the defendants not only acquired title to the water, but

they also secured an easement for the conveyance of the water in that particular canal. If the same quality and quantity of water as that to which the defendants acquired title were delivered at their pipe-line at the times and in a manner which would not disturb their prescriptive use of it, they could not complain. If, in the interest of saving the loss by percolation and evaporation incident to transporting the water five miles through the open canal, the plaintiff was permitted to deliver a like amount and quality of water by means of pipe-lines, the defendants would not be injured and could not complain. The mere substitution of the means of conveyance of the water from Tule River to the defendants' properties was not an issue in this case. We are therefore of the opinion there was no error in finding that the defendants were entitled to their specific awards of water to be taken from the Tule River diversion at the mouth of the McArthur canal and transported through this canal to their properties, together with an easement in this canal with the privilege of repairing and maintaining it in the same condition in which it existed during the time they acquired prescriptive title thereto.

This disposes of the plaintiff's appeal. We will now consider the defendants' appeal.

The defendants claim to have acquired by deeds of conveyance from John McArthur an amount of water in addition to the allotments obtained by prescription and awarded to them in this action. The court construed the language of these instruments affecting the water rights to constitute a mere confirmation of their prescriptive title thereto, and found that these deeds conveyed to them no additional water. From this portion of the judgment the defendants have appealed.

The language of these instruments which requires construction with respect to the water rights will be hereafter quoted. January 12, 1906, John McArthur conveyed all of his land north of Pit River to the family corporation. In this deed he reserved to himself and wife certain privileges appertaining to the enjoyment of water rights for the benefit of the home place south of the river in the following language: " . . . save and except the right of John McArthur or Catherine McArthur, their heirs or assigns, to use at all times free of charge for the purpose of irrigating the lands

which they or either of them own or may own lying on the south bank of Pit river, or for any other purpose for which it may be wanted on those lands or any other lands, *the line of iron pipe now in use, together with the headgates and ditches connected with it,* and the right to repair and maintain the said line of iron water pipe so as to secure the water wanted at all times. Said iron water pipe commences on the northwest quarter of the northeast quarter of section sixteen in township thirty-seven, north of range five east, M. D. M.''

In deeding the home place to his wife in September of the following year, John McArthur conveyed to her all of the water rights appurtenant to the land which he possessed, in the following language: '' . . . Also water rights connected with said lands, including all of an iron water pipe line commencing on the northwest quarter of the northeast quarter of section sixteen in township thirty-seven, north of range five east, M. D. M., and running southeast, together with the right to use all headgates and ditches connected with said iron water pipe line in supplying said iron water pipe line with water and the right to maintain and repair same when necessary.''

Catherine McArthur died in 1917. Her estate was distributed in equal one-sixth shares to her children. Luther McArthur subsequently acquired the entire interest in the home place. The water rights appurtenant to this home place were described in the decree of distribution which was entered in the Catherine McArthur estate in the exact language of the deed from John McArthur to his wife, as above quoted, except that the following sentence was omitted from the decree of distribution, to wit: ''in supplying said iron pipe line with water''. The omission is immaterial.

In conveying his one-sixth interest in the home place to Roderick McArthur in April, 1918, his brother Scott employed the precise language affecting the water rights which was used in the decree of distribution.

In their several separate deeds of conveyance of their respective one-sixth interests in the home place, which instruments were executed in February, March, June and July, 1920, the heirs, Roderick, Anna, Luther and Frank McArthur and Victoria Cadwallader, in referring to their water rights in the premises, employed the following language: ''Also

an undivided one-third interest in and to the right to use all the water which flows through a thirty (30) inch pipe, under a four (4) foot pressure, from that certain ditch or canal beginning at the diversion gates in the Tule river . . . (describing the land through which the McArthur canal extends), together with the right to have said water conducted through the above described ditch and the right of access to and over and along the said ditch from the point where said water is taken from said ditch in said pipe in said section sixteen through the sections aforementioned to the said diversion gates in the said Tule river, with the right to keep said ditch in repair if the party of the second part so elect; it being the intention herein simply to convey the amount of water herein described measured through said pipe, and the right to have the water conducted as aforementioned, and it is not intended to convey any rights in the lands aforementioned except the right of access along the said ditch for the purpose of necessary repairs to the same. Also all water rights connected with said lands.''

A reasonable construction of the language of the original deed of conveyance from John McArthur to the McArthur family corporation indicates that the grantor did not purport to specifically reserve for the use of the home place south of Pit River any water whatever. He evidently assumed that was unnecessary since the home place was not conveyed.

The language of that instrument is unambiguous. It reserves to the grantor and his wife only "the right . . . to use . . . *the line of iron pipe* now in use, together with the headgates and ditches connected with it . . . so as to secure the water wanted at all times". This language seems to clearly infer that the grantor intended to reserve the use of the line of iron pipe, together with the headgates and ditches connected therewith, as a means of conveyance of the water to which he was entitled by prescription, from Tule River to the home place. This is the meaning of the preceding language employed in the same reservation, as follows: " . . . save and except the right . . . to use . . . for the purpose of irrigating the lands which they . . . own . . . *the line of iron pipe* now in use, together with the headgates and ditches connected with it . . . " From this reservation of the pipe-line and ditches which were located chiefly

on the land he was conveying, without specifically mentioning the water, it seems apparent the grantor recognized the fact that certain prescriptive water rights existed appurtenant to the home place. He specifically provided, by means of this reservation, that his right to convey this water belonging to the home place through the pipe-line and ditches across the premises which were deeded should not be disturbed.

■ The court found that 542 acres of the home place were entitled to 33½ cubic feet of water per second which were acquired by prescription. This water supplied the needs of the home place for many years. It flowed from Tule River through ditches and a pipe-line. Unless expressly conveyed by the owner, it would remain as an easement which is appurtenant to the land. (*Farmer* v. *Ukiah Water Co.*, 56 Cal. 11; *Clyne* v. *Benicia Water Co.*, 100 Cal. 310 [34 Pac. 714]; *Stanislaus Water Co.* v. *Bachman*, 152 Cal. 716, 724 [15 L. R. A. (N. S.) 359, 93 Pac. 858]; *Franscioni* v. *Soledad L. & W. Co.*, 170 Cal. 221 [149 Pac. 161]; 25 Cal. Jur. 1030, sec. 30.)

In subsequently deeding his home place to his wife, John McArthur does specifically convey all "water rights connected with said lands", together with the right to use the pipe-line, ditches and headgates. The same language was used in the decree of distribution in conveying the water rights of his home place to the heirs. Scott McArthur used this exact language in subsequently conveying his interest in this home place to Roderick. In none of these instruments is any specific amount of water or character of title thereto indicated. There is no suggestion that the grantors are purporting to convey an interest in water acquired by deed as distinguished from prescriptive title thereto. Upon the contrary, it seems apparent that all parties interested in these various conveyances assumed that the respective tracts of land were entitled to certain allotments of water which had been acquired by prescriptive use for necessary and beneficial purposes.

■ This leaves only the language of the deeds of conveyance from the remaining heirs to Luther McArthur to be considered. The language respecting the water rights which is employed in these deeds is more explicit in describing the quantity of water sought to be conveyed. These heirs could convey no more water or title different in character from

that which they possessed. There is no satisfactory evidence that any of them ever held title to an interest in water rights which were acquired by purchase, devise or otherwise, except such prescriptive rights as were awarded to them in this proceeding. There is no evidence from which we may reasonably infer that the defendants were possessed of any other water rights. If such rights had been acquired by appropriation, they seem to have been waived and abandoned by nonuser, except as to the portion thereof which was awarded to them. A careful examination of these instruments of conveyance and a reading of the record convinces one that the grantors were attempting to preserve their respective titles to their prescriptive rights to use the water of Tule River for the benefit of their land bordering on Pit River. Reference is made to the headgates, ditches and pipe-line which for many years was the sole method of conveying the water from Tule River across the swamp-lands to their properties on Pit River. The description and capacity of the pipe-line referred to in the deeds indicate that they allude to the identical means of enjoying the very prescriptive rights to the same water which was awarded to the defendants in this action. There was no other 30-inch pipe-line in use. All the natural and reasonable inferences · from the record support the court's findings to the effect that these deeds merely confirm or preserve for the use of the defendants the very prescriptive rights to water which were awarded to them in this action. The theory of the defendants that they possessed title to a quantity of water procured by means of deeds of conveyance which is distinct from the prescriptive rights awarded to them in this action seems inconsistent. ▮▮▮ The law will not permit one to hold in reserve a quantity of water acquired by purchase or deed or otherwise which is available for irrigation or domestic purposes, and put it to no use whatever while the same owner claims prescriptive or riparian rights to other water secured from the same source for the purpose of irrigating the identical premises. ▮▮▮ Prescriptive rights to water are based primarily upon necessity. If one owns an ample supply of water for all necessary purposes procured by deed or otherwise, it follows that he may not store it up and hold it in idle reserve while he resorts to another supply of water which he seeks to obtain by prescriptive use. ▮▮▮ We must pre-

sume that the court awarded to the defendants *all the water* necessarily and beneficially used upon their respective properties which they acquired by prescription. If this be true, the defendants may not quiet title to their prescriptive use of water and in the same action assert a conflicting title by deed to a further quantity of water to be used for the same purpose. These claims are utterly antagonistic. The title to an adequate supply of water by deed will defeat the claim of prescriptive rights to water to be used on the same land for the same purpose.

Nor may the defendants claim riparian title to water taken from Tule River to be used upon their lands adjoining Pit River. The lands for the use of which the water involved in this action was claimed are riparian to Pit River and not adjacent to Tule River. These rivers occupy different watersheds. A divide separates them. The water to which the defendants claim title was taken from Tule River and conveyed across the swamp-lands through a canal which is five miles in length and which penetrates the ridge and carries the water into a different shed for use in irrigating land riparian only to Pit River. Under such circumstances riparian rights to water from Tule River may not be claimed for the purpose of irrigating land which borders on Pit River.

Riparian rights to water for the benefit of property adjoining a stream exist independently of any claim of the owner. (*Perry* v. *Calkins,* 159 Cal. 175 [113 Pac. 136].) Riparian rights are acquired as a common-law appurtenance to the land, or as a part and parcel of the soil itself. Such rights are separate and distinct from prescriptive or contractual rights to water. (*San Bernardino* v. *Riverside,* 186 Cal. 7, 13 [198 Pac. 984] ; 25 Cal. Jur. 1019, sec. 22.)

It is true that an owner of land adjacent to a stream may acquire prescriptive title to water therefrom, distinct from, or even in addition to his normal riparian rights. It is also true that the acquiring of prescriptive rights to water from a stream by using it without objection on the part of the owner for the statutory period of time may defeat the owner of his riparian rights. (*Healy* v. *Woodruff,* 97 Cal. 464 [32 Pac. 528] ; *Rindge* v. *Crags Land Co.,* 56 Cal. App. 247 [205 Pac. 36] ; *California etc. Co.* v. *Madera Canal & Irr. Co.,* 167 Cal. 78, 85 [138 Pac. 718, 721].)

In the case last cited it is said: "One actually diverting water under a claim of appropriation for a useful or beneficial purpose, cannot by such diversion acquire any right to divert more water than is reasonably necessary for such use or purpose, no matter how long a diversion in excess thereof has continued, and . . . there is no such thing as an acquirement by such an appropriator of a title by prescription in so far as the excessive diversion is concerned."

It is argued that Scott McArthur acquired prescriptive title to a quantity of water used by him in irrigating the swamp-land riparian to Tule River, which water was conveyed to Roderick by deed dated April 26, 1918. This deed purported to transfer "all the water rights connected with said lands". It is also contended that Scott acquired an additional quantity of water by means of statutory appropriation on the part of John McArthur of 180,000 inches of water, notices of which were posted and filed in January, 1902. These claims are untenable.

An appropriator obtains title to the extent only of his use of the water for beneficial purposes. (26 Cal. Jur. 44, sec. 223; 27 R. C. L. 1273, sec. 183; *Jennison* v. *Kirk*, 98 U. S. 453 [25 L. Ed. 240]; *California etc. Co.* v. *Madera Canal & Irr. Co.*, 167 Cal. 78 [138 Pac. 718].) Under the law of appropriation the right to the use of water lasts only so long and is effective only to such an extent as the actual use is exercised.

Upon the contrary, riparian rights are appurtenant to the land and are not waived by a failure to use them. Riparian rights are perpetual whether they are exercised or not. (1 Wiel on Water Rights, 3d ed., p. 20, sec. 18.) But riparian rights, being appurtenant to the lands bordering on the stream from which they are acquired, may not be sold and transferred to the injury of any other riparian owner for use on nonriparian lands remote from the stream upon which they depend. (*California etc. Co.* v. *Madera C. & I. Co.*, *supra;* *Duckworth* v. *Watsonville etc. Co.*, 150 Cal. 520 [89 Pac. 338, 341]; *Spring Valley W. Co.* v. *County of Alameda*, 88 Cal. App. 157 [263 Pac. 318]; 27 R. C. L. 1070, sec. 11.)

In the Madera case, *supra*, regarding the effect of a grant of riparian rights by an owner, it is said: "The effect of such a grant is simply to convey the grantor's right to the use of the water on his own riparian land, and to estop the

grantor to complain against any use of the water which the grantor may make to the injury of such riparian right.''

In the Duckworth case, *supra*, it is said regarding the same subject: ''No one can sell or convey to another that which he does not himself own. Grimmer could not by a transfer of his riparian rights sell to the plaintiff, as against third persons having interests in the water, the right to use the water upon any land, riparian or non-riparian, except his own, to which it originally attached. His deed operated to prevent him from complaining of a diversion, but it did not affect other parties.''

It follows that any effort on the part of Scott and Anna McArthur to deed to Roderick their interest in the waters of Tule River, acquired by appropriation or riparian rights appurtenant to the swamp-lands, in excess of the quantity actually, necessarily and beneficially used either on the swamp-lands or on the lands adjacent to Pit River, was void as against the rights of the plaintiff. All the waters acquired by appropriation or adverse possession which were necessarily and beneficially used on the defendants' land were awarded to them. All the riparian rights appurtenant to and necessarily used for the benefit of the swamp-lands were conveyed by Scott McArthur to the plaintiff after the commencement of this action.

The record will not support the contention that the defendants are entitled to an additional amount of water salvaged from the swamp-lands. There is no evidence to indicate that any such rights were acquired or preserved.

The entire history of this case indicates that the deeds of conveyance upon which the defendants rely for their claim to water in addition to the allotments awarded to them were executed only to preserve and confirm the same prescriptive rights to which they were awarded in this action. The defendants' appeal is, therefore, without merit.

The judgment is affirmed, neither party to recover costs.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 22, 1930, and petitions by plaintiff and appellant and by defendants and appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, were denied by the Supreme Court on December 22, 1930.