**UNITED STATES of America,**
**Plaintiff,**

v.

**Roy HUNTER, Defendant.**

**No. 2315–ND.**

United States District Court
S. D. California, N. D.
Oct. 21, 1964.

Francis C. Whelan, U. S. Atty., and James R. Akers, Jr., Asst. U. S. Atty., for the Government.

Butterworth & Smith, Edward L. Butterworth, Los Angeles, Cal., for defendant.

CROCKER, District Judge.

This is an action by the Government to enjoin defendant from watering and grazing his cattle within the boundaries of Death Valley National Monument. The presidential proclamation which created the Death Valley National Monument on February 11, 1933, provided that:

"The Director of the National Park Service under the direction of the Secretary of the Interior, shall have the supervision, management, and control of this monument as provided in the Act of Congress entitled 'An ACT to establish a National Park Service, and for other purposes,' approved August 25, 1916 (39 Stat. 535–536), and acts additional thereto or amendatory thereof."

This statute provides that the Secretary may issue grazing permits in all National Parks (except Yellowstone) and monuments. (16 U.S.C. § 3.) The defendant has refused to apply for a permit although by Title 36, Code of Federal Regulations 1.20, the running at large, herding, driving across, or grazing of any livestock is prohibited, unless a permit has first been procured, and he has refused the request of the Superintendent of the Death Valley National Monument to remove his cattle from the monument.

Defendant claims a vested right to continue to water his cattle at springs within the area now known as Death Valley National Monument without securing a permit, and without any interference by any agent of the United States Government. This claim is based upon the apparently undisputed fact that he and his predecessors in interest, his father and grandfather, have watered cattle at said springs continuously since 1871. Defendant claims that by the continuous consumption of water by his cattle at these springs upon the public domain he has acquired an appropriative right to continue to water his stock there without supervision or regulation by the Government. Defendant concedes that possibly his use of the said water at the springs may be enjoined by the Government, but claims that if so, he should receive compensation for the deprivation of his use. He has indicated his willingness to waive any claim to compensation in excess of the jurisdictional amount of $10,000.

It is the Government's contention that defendant in grazing his cattle in Death Valley National Monument without a permit is a trespasser, and it is legally entitled to have him perpetually enjoined from causing his cattle to graze therein.

Defendant's claim to a legally vested right is based upon the Act of 1866, 14 Stat. 251, enacted by the United States Congress in that year. The area in which the springs are located is public domain, so defendant is not claiming any right to the water as a riparian owner. Likewise, it is well-settled that no right by prescription may be obtained as against the Government.

It necessarily follows that the only possible basis for defendant's defiance of the Government's order to either secure a license or remove his cattle from the public domain within Death Valley National Monument is a right acquired by appropriation. Defendant claims that by the continuous watering of his cattle at the springs he not only acquired an appropriative right to the quantity of water consumed by the cattle—from 200 to 400 head—, but he also claims that he acquired a right to graze the cattle at the springs as a necessary incident to the watering of the cattle, since it is a physical impossibility for him to water the cattle at the springs unless he can also permit the cattle to graze upon the land upon which the springs are located. He likens the right to graze his cattle to an easement for the conduct of water over another's land by means of pipes, conduits, canals and ditches. In other words, it is defendant's contention that he not only acquired the vested right to an indefinite amount of water from the

springs by appropriation but that he likewise acquired a vested right to the use of an indefinite area upon which the springs are located for grazing purposes.

The arguments sustaining his position are somewhat convincing, but an examination of the history of the Act of 1866 and an analysis of the decisions interpreting that Act compel the conclusion that under the facts of the instant case no rights by appropriation, either to the use of the water of the springs for the watering of defendant's cattle or to the nearby contiguous land for grazing purposes, were ever acquired by defendant.

■ It is well-settled that prior to the passage by Congress of the Act of 1866 any person settling upon or occupying land of the public domain in the Western States, or using any of the water thereon, was a mere trespasser and could acquire no rights as against the owner, the United States Government. However, the United States Government took no steps as against such trespassers, and such a failure to assert its rights of ownership, in effect, encouraged and promoted the occupancy of the lands and the use of their natural resources by the trespassers. After the discovery of gold in California in January 1848, followed by the ceding of part of the public lands of Mexico to the United States by the Treaty of Guadalupe Hidalgo, 9 Stat. 922 on July 4, 1848, a rush of population from the East poured into California to occupy and mine the public lands now belonging to the United States. As disputes arose between the miners as to possession of mining locations as well as the use of water necessary to successful hydraulic or placer mining operations, customs became established in the mining camps to the use of water by prior appropriation—"first in time, first in right"— which became valid local law in the absence of any specific State or Federal legislation authorizing the appropriation of water, or providing procedural steps for acquiring appropriative rights therein. Hutchin's "California Law of Water Rights," p. 43, et seq.; Jennison v. Kirk (1879) 98 U.S. 453, 457–458, 25 L.Ed.

240. These customs and regulations upheld in court as valid local laws were naturally favorable to the mining industry, and on April 20, 1852, St.1852, p. 158, an enactment by the California legislature entitled, "An Act prescribing the Mode of maintaining and defending possessory actions on Public Lands in this State," specifically provided that any person "now occupying and settled upon, or who may hereafter occupy or settle upon any of the Public Lands in this State, for the purpose of cultivating or grazing the same" could maintain an action for interference, with or injury done his possession, "PROVIDED that, if the lands so occupied and possessed, contain mines of any of the precious metals, the possession or claim of the person or persons occupying the same for the purposes aforesaid, shall not preclude the working of such mines by any person or persons desiring so to do as fully and unreservedly as they might or could do had no possession or claim been made for grazing or agricultural purposes."

The Supreme Court of California interpreted the Act as giving miners superiority of possession not as against all non-miners, but only as against occupiers and settlers of public lands for the purpose of cultivating or grazing the same. Tartar v. Spring Creek Water & Mining Co., 5 Cal. 395; Fitzgerald v. Urton, 5 Cal. 308, 309; Burdge v. Underwood, 6 Cal. 45, 46. It will be noted that this early California legislation as interpreted by the courts with reference to the water rights of settlers upon land for the purpose of agriculture or grazing placed such settlers in a distinctly third-class category.

■ These rules and regulations, although applicable as between the holders of possessory rights, could not, of course, be controlling in any litigation as between the holders of a possessory right and the paramount title of the United States as the owner of the public domain. This lack of any possibility of acquiring a secure title by such settlers necessarily militated against the expenditure of large sums of money or time and effort

in the development of mines, and to remedy this situation Congress enacted the Act of 1866 which was primarily a mining law but also contained a section relating to water rights on the public domain. 14 Stats. 253, sec. 9; U.S.Revised Stats. sec. 2339 (July 26, 1866). This Act was motivated by a desire to promote the industrial growth of the Western States by recognizing pre-existing rights secured by the expenditure of time and money and by encouraging and promoting the expenditure of time and money in the future. This legislation was not only a recognition of pre-existing rights but the establishment of a rule for the future. Broder v. Natoma Water and Mining Co., 101 U.S. 274–277, 25 L.Ed. 790.

> Section 9 of said Act reads as follows:
>
> "Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right-of-way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage."

In 1870 this section was supplemented by Section 2340 of the Revised Statutes which provided:

> "All patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued water-rights, or rights to ditches and reservoirs used in connection with such water-rights, as may have been acquired under or recognized by the preceding section."

The Act of 1866 contained no procedure by which rights could be acquired from the United States but recognized and acknowledged rights established by local customs, laws and decisions of courts. In California, therefore, the local customs, laws and decisions of courts of California became the criteria for the determination of the acquisition of water rights in that state. In 1872 the California legislature provided specific procedure for the appropriation of water. Cal.Civ.Code, §§ 1410–1422. However, this procedure was not exclusive, and non-statutory appropriations could be made simply by diverting water and putting it to use without following the statutory procedure.

Defendant argues that the raising of cattle is a beneficial use of water, and this being so, his right to use the water of the springs on the Government land is similar to and equal to the appropriative rights acquired by the miners under the customs, laws and decisions of the courts with reference to mining rights. He then argues that since an easement may be acquired for the conducting of appropriated water by means of pipes, conduits, canals and ditches, he obtained an easement or right to permit his cattle to graze upon land owned by the Government, since the watering of his cattle did not require him to conduct water from the springs through pipes, conduits, ditches or canals.

But, the analogies upon which he depends to support the final conclusion which he reaches are not true analogies. Conceding that cattle raising is a beneficial use of water, and even conceding for the sake of argument that it is an even more beneficial use than mining, nevertheless, the rights to be protected under the Act of 1866 were the rights established by local customs, laws and decisions in California and these did not equate the business of cattle raising with the mining industry. The fact that, in fairness, perhaps the cattle business should have been treated with the same

favoritism as the mining industry does not compel the conclusion that it did so. No decision has been cited directly supporting defendant's contention that vested appropriative rights were secured by cattle owners merely permitting their cattle to graze on Government owned land. Evidence as to such custom has not been offered, and the law as indicated by the California Act of 1852 points to the contrary, and a determination that an appropriative right to the water under the Act of 1866 depends upon the customs, laws and decisions of courts of California. In the absence of any proof, a claim of the acquisition of an appropriative right fails.

An actual diversion of the water from its non-adjacent land is not always necessary to the acquisition of an appropriative right to the water. The appropriation of water to carry on mining operations on the bank of a stream could be acquired. The case of mill sites for refining of ore, or appropriation of water for a saw mill upon the bank of a stream, are examples of appropriation without diversion. The decision herein is predicated solely upon the conclusion that in the instant case no legal basis for the acquisition of an appropriation to water cattle by virtue of local customs, laws or decisions of California has been established.

■ However, it may also be noted that the argument that an easement for grazing is necessarily an incident to an appropriative right to watering livestock also lacks merit. The right to graze cattle on another's land is quite different from an easement to traverse another's land by pipes, conduits, ditches, or canals. The right to graze cattle could destroy the entire usefulness of the land for other purposes, whereas the traversing of the land by pipes, conduits, ditches or canals would cause a trivial inconvenience.

The injunction is therefore granted.

Counsel for plaintiff is directed to prepare and lodge findings of fact, conclusions of law and form of judgment in accordance with Local Rule 7.

The clerk of this court is directed to serve copies of this order by United States mail upon the attorneys for the parties appearing in this cause.